## SIMMONS v. WESTERN ASSUR. CO.
### No. 14237.

United States Court of Appeals
Fifth Circuit.

June 30, 1953.

Rehearing Denied Aug. 11, 1953.

Chandler Lloyd, Biggers, Baker, Lloyd & Carver, Dallas, Tex., Joe McCasland, Jefferson, Tex., for appellant.

Lucian Touchstone, W. Richard Bernays, Dallas, Tex., for appellee.

Before HOLMES, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Jay Simmons sued Western Assurance Company to recover damages sustained by him when portions of an oil well drilling rig owned by him and leased to White-Webb Drilling Company were damaged or lost in a blow-out and cratering of an oil well near Jefferson, Texas. The rig had been rented by Simmons to White-Webb Drilling Company under an agreement which provided that the lessee was to be responsible to Simmons for any damage or loss of any kind, ordinary wear and tear excepted, and which further provided for the lessee to keep the drilling rig insured for the lessor's benefit against various hazards, including hazards resulting from blow-outs, with the qualification, "however, should you desire not to carry said insurance but assume said risk without insurance, you may do so by hereby agreeing to pay me for any and all loss sustained by fire, windstorm, explosion or blow-out damage."

At about 8 a. m. on Sunday, September 4, 1949, the rig in question had drilled to a depth of 338 feet when a blow of gas occurred, and sand, shale, water and mud were blown from the hole to a considerable height. This blow continued until approximately 11:30 a. m. when it quit completely without damage to the drilling rig. Normally, gas is not encountered in this area until a depth of 5900 to 6000 feet and would not be expected at a depth of 338 feet.

Webb was the field man for White-Webb Drilling Company and White, who lived in Dallas, was the office man and handled the insurance matters. Webb was reached by long distance telephone at Shreveport, Louisiana, and arrived at the location of the well about 1 p. m. on Sunday, September 4, and found the condition then quiet but with evidence of the blow earlier in the morning. Webb gave the drilling crew instructions not to proceed with the drilling because he wanted to find out whether the rig was covered by insurance. He was unable to reach White by telephone and then succeeded in

having a telephone conversation with Simmons. Simmons and White both living in Dallas, Simmons stated that he would attempt to contact White and to have White get in touch with Webb; and further stated to Webb that, unless there was insurance or unless it could be secured immediately, he wanted the rig torn down and moved away from that location. Webb agreed that, if the rig was not insured and insurance could not be obtained, he would move the rig off.[1] Simmons finally got in touch with White, told him of the situation, and White said that he did not know whether the rig was covered by insurance or not, but that he would find out. Simmons testified that White later called him back and said that, "I would have the insurance; he was working on it then, and for me to stand by."

White finally located Mr. E. G. Dean, an insurance broker who resided in Dallas but who was spending the Labor Day week end at Mineral Wells, Texas. Dean was a partner in the E. G. Dean & Company, insurance agency, which wrote and handled the insurance business of the White-Webb Drilling Company. White did not testify, but Dean's testimony shows that, while White told him about the blow-out, he treated the matter in a jovial spirit and made light of it, and further represented to Dean that Dean's partner, Lander, had theretofore bound insurance on the rig in question. That representation turned out to be false. Dean's testimony as to his further conversation with White is set out in the footnote.[2]

Frank Rimmer & Company were general agents for Western Assurance Company. Dean telephoned Eagleston of Frank Rimmer & Company and mentioned the substance of his conversation with White, but failed to say anything to Eagleston about the blow-out, "because White treated that part of it so insignificantly, after he got into the conversation, that I just didn't mention it to Eagleston, because the paramount thing in White's mind was to get his men back to work." Dean requested Eagleston

<hr />

[1.] The conversation, according to Simmons, was:

"He (Webb) says, 'Part of our rigs that we are operating are covered, some are not. Whether this one is or not I want to talk to him about it, and if it is covered, I am going to start up. If it is not covered, I want him to insure, and if he can't insure it, I'm going to move the rig off.' I told him I wanted him under my contract, by all means, in dangerous areas I wanted it insured, and if it was not insured, or rather if he couldn't get it insured, in the event that it wasn't already insured, by all means to move it off * * *."

2. "And he said, 'Simmons won't permit our men to go back to work down there until we get confirmation in his hands that there is insurance on the rig, and I want you to wire Simmons confirmation of that insurance that Lander bound for me.' He said he was unable to locate Lander in Dallas. I said, 'Well, James, I have no knowledge of any binder of that type, in the first place, and in the next place, I wouldn't have any authority to wire confirmation on something I didn't know anything about.' And I tried—I was trying to help him, because I felt if he had some men idle down there that needed to go back to work, I would do anything consistently that I could to help get them back. I tried to think how I could find out whether or not a binder had been placed on the rig. I tried to think if I could get hold of some of our girls in our office, and I couldn't recall where I could locate any of them. And I believe, if I'm not mistaken, that I told White I would see what I could do and would call him back. In the meantime, a friend of mine came to my room, Mr. Walter Munger, a newspaper man at Mineral Wells, and we walked down in the lobby of the hotel, and I was going through the lobby and they paged me, and it was White calling again, and I had had a little time to think it over, and being unable to determine how I could get hold of anybody that had knowledge of whether a binder was in existence or not, I told White I would call Mr. Eagleston, of Frank Rimmer & Company, and he could doubtless find out through some of his personnel whether or not a binder was in existence. James said, 'Oh, there is no doubt about it being bound.' He said, 'The insurance is bound all right.' I said, 'Well, I will call Tom Eagleston and have him call you, and give your telephone number to him, and you tell him the story that you have told me.' And that was the substance of the conversation I had with White."

to telephone to White, and this Eagleston did.

Again White did not testify, but the substance of the conversation, according to Eagleston, was that White told Eagleston that he had a rig leased from Jay Simmons, that the rig had been set up and was ready to go to work, but that Simmons would not let him go to work until such time as he had evidence of insurance, that his crew was standing idle and he was anxious to get confirmation of a binder of insurance that had been arranged earlier in the week, and he wanted Eagleston to send some evidence to Simmons that he had arranged the insurance. Continuing, Eagleston testified:

"I told White at the time that the office was closed, I had been out of town during the week before, that the office was closed, our people were scattered over the country for a long Labor Day week-end, and I had no way of checking up on what binder had been issued, the basis it had been issued, and that I couldn't give him any information until we got back to the office on Tuesday, when I could check up.

"He plead with me at some length and stressed the expense that he was having from an overhead standpoint, with the crew standing by, idle, and he was most anxious to get started and Mr. Simmons wouldn't let him start without some confirmation—

\* \* \* \* \* \*

"After we had talked some time on the telephone, him telling me what he told me, I suggested that I would call Mr. Jay Simmons and talk to him on the telephone, and White then asked me if I wouldn't just send Mr. Simmons a telegram confirming the binder that he had assured me had already been arranged with my office. I took the man at his word. I operated in good faith; I thought he was."

Eagleston further testified that White did not tell him about the blow-out of that morning, nor did he reveal that there was any present danger or hazard connected with the risk. Eagleston did not talk to Simmons, but sent him a telegram reading as follows:

> "1949 Sep 4 PM 5 25
> "DCO3 SSC33
> "D. LLC 493 PD Dallas Tex 4 403 P
> "J. Simmons
>   "5022 Seneca Drive Dal (DLY)
>   "Confirm Bindings Drilling Rig Owned By J Simmons Leased To White Webb Drilling Company Located Near Jefferson Texas $100000 In Regular Perils Including Blow-out And Cratering Subject 100 Percent Co-Insurance Effective 400 PM September 4th Binder Western Assurance Company—
>     "Frank Rimmer & Co.
>     "By Eagleston
> "$100000 100 400 PM 4"

Shortly after 4 p. m. Simmons received a telephone call from the Western Union and the message was read to him, and later on it was delivered to his home. After Simmons received the telegram, he took no further steps. There was evidence that the trucks and equipment were available for the purpose of moving the rig off the location and that it could have been moved in about two hours. Beginning about 6:30 or 6:40 p. m. the well blew out again with terrific force and continued to blow wild until about midnight, the ground around the location cratered, the derrick fell over, and a large part of the rig was lost in the hole, with resultant damage apparently in excess of $50,000.

The District Court charged the jury that "Mr. Simmons stands in no better position than did Webb and White", and submitted to the jury the issues going to whether the defendant entered into any valid contract of insurance, whether White falsely and fraudulently represented to the defendant's agent that a binder had previously been issued covering this particular drilling rig, and whether White fraudulently failed to disclose to any authorized agent of the defendant the fact of the blow-out on the morning of September 4 and of the hazardous and dangerous condition existing at the location of this drilling rig. The jury

returned a verdict for the defendant and the court entered judgment thereon.

■ The appellant's first insistence on error is that the court erred in refusing to instruct the jury that the telegram in evidence constitutes a contract of insurance between Western Assurance Company and Simmons, insuring Simmons against loss or damage to his drilling rig by a blow-out and cratering from and after 4 p. m. on September 4, 1949, and that the jury should find for the plaintiff, Simmons, for the amount of loss or damage suffered to the drilling rig by blow-out and cratering after 4 p. m. on September 4, 1949. Simmons had not applied for such insurance and had had no dealings with anyone representing Western Assurance Company, except insofar as White was either representing him or was acting for his benefit. If White acted as Simmons' agent, then, of course, Simmons was bound by White's representations and concealment. If the contract of Western Assurance Company was with White-Webb Drilling Company, the lessee, for the benefit of itself and of the lessor, Simmons, as their interests might appear, then the principle becomes applicable that the third party beneficiary can acquire no better right to enforce the contract than that held by the contracting parties themselves. Seward v. South Florida Securities, 5 Cir., 96 F.2d 964, 967; Dickson v. Day, Tex.Civ. App., 275 S.W. 307, 309; Breaux v. Banker, Tex.Civ.App., 107 S.W.2d 382, 387, affirmed 133 Tex. 183, 128 S.W.2d 23; Hamburg-Bremen Fire Ins. Co. v. Ruddell, 37 Tex.Civ.App. 30, 82 S.W. 826; Georgia Home Ins. Co. v. Golden, 127 Tex. 93, 91 S.W.2d 695, 696; Annotation 81 A.L.R. 1272; 10 Texas Jur., Contracts, Sec. 281, p. 485; 2 Williston on Contracts (Revised ed.) Sec. 364.A, p. 1061, Sec. 394, pp. 1136, 1137.

Appellant's next insistence is that the District Court erred in refusing to instruct the jury "that whatever else you have found, if you find that Jay Simmons would have and could have removed the drilling rig, but that he did not do so because he relied upon the telegram, you will find for the plaintiff in an amount, if any, and in the manner I have previously instructed you."

Simmons had pleaded that, when he received the telegram in question, he placed full faith and reliance upon it as giving him insurance coverage on the rig and that, had he not received the telegram, he would have had the rig torn down and removed from the location and thus would not have sustained the loss. He further pleaded that he had made no representations of any kind or character, was guilty of no concealment, but was perfectly innocent and had sustained a serious loss in reliance on the telegram. In effect, Simmons claimed *estoppel in pais* against the appellee. The District Court did not submit this theory of recovery to the jury.

■ The appellee insists that the requested special charge to the jury was properly refused, if for no other reason, because it referred to an incorrect measure of damages. We will not pass on that question because, whether the charge was defective in that respect or not, it was sufficient to raise the question of the applicability against the defendant of *estoppel in pais* by reason of the representations contained in the telegram. See Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A.; Reeve Bros. v. Guest, 5 Cir., 132 F.2d 778; 3 Am.Jur., Appeal & Error, Sec. 379, Note 14, p. 112. Appellee answers, however, that Simmons had no right to insist upon insurance or removal of the rig, having agreed with White-Webb that it was optional with them whether they carried insurance on the rig or not. Simmons' legal rights under his lease contract with White-Webb in this respect are beside the point. According to the testimony of both Webb and Simmons, Webb had stated that he would remove the rig if it was not covered by insurance, and Simmons had insisted on that being done. (Footnote 1, *supra*.) According to the testimony of Dean and of Eagleston, the reason for reassuring Simmons as to the insurance was White's statement that Simmons would not permit the men to work until he had confirmation in his hands of the fact that there was insurance coverage on the rig. There was thus

substantial evidence that it was within Simmons' power to take steps to protect his property. It is immaterial whether such steps would have been under his lease contract with White-Webb or by independent arrangement or agreement.

■ Appellee next insists that it is undisputed that the equipment had remained at the well site from a time since the first blow-out and until after 4 p. m., a space of some four or five hours, without any attempt being made to remove it; and that Simmons' conduct in permitting the equipment so to remain until the second blow-out, about two and one-half hours later, was not in reliance on the telegram. That, however, in our opinion, was a question of fact for the jury, not for the Court to decide.

■ Appellee then insists that White was Simmons' agent in attempting to procure the insurance. White-Webb Drilling Company, as the lessee of the rig, had authority to insure it for their own benefit and for the benefit of the lessor, Simmons. Whether White acted as Simmons' agent, or solely for White-Webb Drilling Company with consequent third party benefits to Simmons, was a question, we think, upon which reasonable minds might differ under all of the circumstances and testimony, and which should therefore be submitted to the jury. There is no contention that Simmons made any misrepresentations or was guilty of any concealment, unless it be held that White acted as his agent.

The telegram was a clear representation by appellee's agent to Simmons that the drilling rig owned by Simmons was covered by insurance against blow-out and cratering. The telegram was intended to influence Simmons' actions. Assuming that White was not acting as Simmons' agent, then, if Eagleston relied upon White's representation that the rig had theretofore been insured and sent the telegram without checking upon the truthfulness of that representation, he did so at his own peril and at the peril of his principal. There would still remain, of course, a very serious question of fact, as to whether there was a material change of position by Simmons in reliance on the telegram. As stated in 3 Pomeroy's Equity Jur., 5th ed., Sec. 812,

"The cases all agree that there can be no estoppel, unless the party who alleges it relied upon the representation, was induced to act by it, and thus relying and induced, did take some action. * * * Although this action is usually affirmative, yet such affirmative action is not indispensable. It is enough if the party has been induced to *refrain* from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss."

■ In Holland v. Blanchard, Tex.Civ. App., 262 S.W. 97, 101, 102, it was said:

"To work an estoppel, the person estopped must have known the facts or been guilty of negligence in not knowing them, and the persons in whose behalf the doctrine is invoked must have relied on and acted on the faith of what the former said or did or omitted."

Other elements of *estoppel in pais* being present, if a third party beneficiary has been induced to alter his position in reliance upon a contract made for his benefit and represented by the promisor to be valid, the promisor may not set up against the beneficiary the defenses which he could have set up against the promisee. See Restatement, Contracts, Sec. 143, pp. 169 and 170; 12 Am.Jur., Contracts, Sec. 289; Annotation 81 A.L.R. 1292; 2 Williston on Contracts, Revised ed., Sec. 397. We think that the District Court erred in failing and refusing to submit to the jury the theory of *estoppel in pais,* including the question of whether White acted as Simmons' agent in the procuring of the telegram and the question of whether in reliance on the telegram Simmons acted or omitted to act to his detriment.

Appellant's next insistence on error is that the District Court erred in leaving to the jury the question of whether E. G. Dean was an authorized agent of Western Assurance Company, and in failing to instruct the jury that Dean was such agent, and that knowledge of any fact in the pos-

session of Dean was knowledge also on the part of Western Assurance Company. In this regard appellant relies upon Article 21.02 of the 1951 V.A.T.S. Insurance Code of the State of Texas, formerly Article 5056 of the Revised Civil Statutes. That Statute has been authoritatively construed not to confer any power or authority upon persons with reference to the making of contracts or to make the insurance company liable for any act of an agent, except as specified in that chapter or law. Hartford Fire Ins. Co. v. Walker, 94 Tex. 473, 61 S.W. 711, 712; Maryland Casualty Co. v. Seay, 5 Cir., 56 F.2d 322. Further, it is clear from the evidence that, at the time of White's conversation with Dean, Dean was on vacation and specifically declined to act as an agent, referring White to Eagleston with the statement, "You tell him the story that you have told me." Certainly the District Court did not err in refusing to charge as a matter of law that Dean was acting as agent of Western Assurance Company.

The appellant next urges that the District Court erred in permitting Eagleston to testify over the appellant's timely objection as to his intention and meaning in the telegram that Eagleston sent to Simmons. Eagleston testified that, when he sent this telegram to Simmons, he did not intend to cover him so far as that rig was concerned, but was confirming what White had told him about the binder being arranged through Eagleston's office, "I had no way of checking it and, as an accommodation to him, I sent the telegram." The main thrust of that testimony was that Eagleston relied upon White's misrepresentation. We think either such testimony was proper or there was no harm in its admission insofar as it related to appellant's theory of a contract of insurance direct with Simmons, for, as we have indicated, such a contract could have arisen only through White as Simmons' agent. On the theory of *estoppel in pais*, however, which should have been, but was not, submitted to the jury, we think that Eagleston should not be permitted to testify to his undisclosed intention in sending the telegram. Simmons could prevail on that issue only if White were not his

agent. Assuming that to be true, Simmons did not have the benefit of Eagleston's undisclosed intention, and had a right to rely upon the telegram written as he received it.

It appears to us that the case was carefully tried and fairly and ably submitted to the jury on all issues excepting only the substantially separate theory of *estoppel in pais*, and that the appellant is not justly entitled to a retrial of the other issues. This Court now has broad authority to "require such further proceedings to be had as may be just under the circumstances." 28 U.S.C.A. § 2106; see, also, Constitution Publishing Co. v. Dale, 5 Cir., 164 F.2d 210, 213. The judgment is, therefore, reversed and the cause remanded for retrial solely upon the issue of *estoppel in pais*.

Reversed and remanded with directions.