146 N.J. Super. 362 (1976)
369 A.2d 987
ELSA NAIMO, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF MARIO BRUNO, JR., AN INFANT, PLAINTIFF,
v.
JOHN J. LA FIANZA, JR. AND DONALD BRUNO, EXECUTORS UNDER THE LAST WILL AND TESTAMENT OF MARIO BRUNO, DECEASED, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 20, 1976.
*365 Mr. Eugene H. Farber for plaintiff (Mr. Louis L. Gluck, attorney; Mr. Farber of counsel and on the brief).
Mr. Mark A. Aurigemma for defendants (Messrs. La Fianza & Aurigemma, attorneys; Mr. Aurigemma of counsel; Mrs. Mary Aurigemma on the brief).
KENTZ, J.S.C.
Plaintiff, individually and as guardian ad litem of Mario Bruno, Jr. (Bruno, Jr.), seeks specific performance of an oral agreement allegedly made by Mario Bruno (Bruno) to make a testamentary gift for the benefit of Bruno, Jr.
The controlling facts are not disputed. It appears from the evidence that plaintiff, while seeking employment in this country, met Bruno in 1949. He was the owner of the business enterprise where plaintiff became employed. On occasion Bruno would drive the plaintiff home from work, and in the summer of 1950 while his family was away on vacation he invited the plaintiff out for dinner. This was repeated several times thereafter and during the course of these meetings Bruno engaged in conversations about his wife and adopted child. He indicated that his reason for the dinner meetings with plaintiff was because he disliked eating alone and was lonesome. This relationship between plaintiff and Bruno continued and he then started buying her presents and showing other acts of kindness and affection. He lamented the fact that he was not able to have children with his wife and he frequently expressed his desire to have a child of his own. He asked plaintiff to have his child and she refused. Bruno kept repeating his desire *366 to have a child and finally offered to support any child that might be born of plaintiff. As a further inducement he said he would get a divorce from his present wife and marry plaintiff. He also promised to leave money for the child upon his death. By this time the relationship between plaintiff and Bruno had grown into a close and amorous one. In view of this, and as a result of his promises on which she relied, plaintiff changed her mind and agreed to have a child with Bruno.
Plaintiff became pregnant in 1950. She miscarried after three months of pregnancy. She testified that she saw Bruno regularly on Saturday mornings and Wednesday afternoons and continued to have sexual relations on these occasions with him in an effort to produce a child for him. Plaintiff further testified that she did not have sexual relations with any other men during this period. Not until 1963 did the plaintiff become pregnant again. Thereafter, a child was born to her on February 11, 1964. As agreed between plaintiff and Bruno, the child was named Mario Bruno, Jr. Plaintiff was admitted into the hospital under the name of Mrs. Mario Bruno. During her hospital stay Bruno visited her every day, and upon her discharge brought her home with the baby. All expenses in connection with the pregnancy and delivery of the child were paid by Bruno.
After the birth of the child Bruno paid the sum of $60 a week for support and also paid plaintiff's rent. He continued to show his great affection and love for plaintiff and his son by visiting the home each day. As the child grew older Bruno gave much of his time and attention to his son and participated as a father in many of his activities. In addition to weekly support payments he bought many gifts for Bruno, Jr. on holidays and other special occasions. He also purchased clothes for his son when they were needed.
Plaintiff testified that Bruno was "crazy" about his son. Although Bruno never actually lived with plaintiff after the child was born, he spent much of his time with plaintiff *367 and his son. He was a very dutiful and interested father. On various occasions he sent plaintiff and his son on summer vacations. It is abundantly clear that he had a very close and affectionate relationship with Bruno, Jr. There can be no doubt that Bruno was the father of this child.
Bruno died suddenly on October 5, 1975. He left a last will and testament which was duly admitted to probate. There was no provision made therein for the benefit of plaintiff or his son.
Plaintiff contends that there was an agreement which should be enforced by specific performance. It is well established law that a person may bind himself by contract to make a particular will. Poloha v. Ruman, 137 N.J. Eq. 167 (Ch. 1945), aff'd 140 N.J. Eq. 396 (E. & A. 1947); Hendershot v. Hendershot, 135 N.J. Eq. 232 (Ch. 1944); Davison v. Davison, 13 N.J. Eq. 246 (Ch. 1861). Equally well established is the proposition that a third-party beneficiary is himself entitled to maintain a suit for specific performance of an agreement between third persons to provide for him by will Hufnagel v. Scholp, 138 N.J. Eq. 16 (Ch. 1946); Hendershot, supra; DiGirolamo v. Di Matteo, 108 N.J. Eq. 592 (Ch. 1931). Similarly, it has been recognized that a promisee of an agreement for the benefit of a third-party donee has sufficient interest in the enforcement of the promise to entitle him to sue. Drewen v. Bank of Manhattan, 31 N.J. 110 (1959); see also, O'Neill v. Supreme Council, Amer. Leg. of Honor, 70 N.J.L. 410 (Sup. Ct. 1904); Annot., 20 A.L.R.3d 541 (1968). However, such agreements must be subjected to close scrutiny. Klockner v. Green, 54 N.J. 230 (1969); Hufnagel, supra.
Defendants maintain that even if there is a contract, it is illegal and unenforceable since it was made in consideration of the commission of a future illicit act of intercourse and adultery.
*368 It is well established that illegal contracts are unenforceable. Carhart v. Lapetina, 137 N.J.L. 531 (Sup. Ct. 1938); Thompson v. Taylor, 65 N.J.L. (Sup. Ct. 1900); Naseef v. Cord, Inc., 90 N.J. Super. 135 (App. Div. 1960), aff'd 48 N.J. 317 (1966); 6 Rutgers L. Rev., 194. However, whether a promise to make a testamentary gift to a future-born illegitimate child in return for illicit acts of intercourse and adultery is an illegal and unenforceable agreement is a question of first impression in this State. However, courts in other jurisdictions have answered this question affirmatively.
The New York Supreme Court has ruled that a contract similar to the one in this case is illegal and unenforceable. Randolph v. Stokes, 125 App. Div. 679, 110 N.Y.S. 20 (App. Div. 1908). In Randolph defendant and plaintiff, an unmarried woman, were dating. As in this case, in the course of their romance defendant told plaintiff that he was very anxious to have a child by her and that if plaintiff would have such a child he would do everything in the world for her and would support the child handsomely until the child was 21 years of age. Immediately thereafter plaintiff and defendant began to engage in sexual intercourse and a child was born to them. Plaintiff then sued defendant to recover on the promise to pay and allow to her a liberal sum of money each month out of which she could support and maintain the child. The court found that the agreement in question was made in part as an inducement to plaintiff to enter upon a career of illicit intercourse and ruled that such an agreement was unenforceable.
The agreement sued upon by plaintiff is similarly tainted by the illegal and immoral consideration to engage in illicit intercourse in return for Bruno's promise to provide for their illegitimate child in his will. This agreement is unenforceable because it is contrary to public policy and void. Colson v. Huber, 74 Ga. App. 339, 39 S.E.2d 539 (D. Ct. App. 1946); Clark's Adm'x v. Callahan, 216 Ky. *369 674, 288 S.W. 301 (Ct. App. 1926); Steele v. Crawford, 197 Ky. 798, 248 S.W. 197 (Ct. App. 1923); Bowling v. Bowling's Admrs, 222 Ky. 396, 300 S.W. 876 (Ct. App. 1927); Burton v. Belvin, 142 N.C. 151, 55 S.E. 71 (Sup. Ct. 1906); Dannells v. United States Nat. Bank, 172 Or. 213, 138 P.2d 220 (Sup. Ct. 1943); Annotation, 20 A.L.R.3d 500 (1968).
In determining the enforceability of the alleged agreement here, this court must also take cognizance of the fact that it arose from an act of adultery since the father here was married and therefore an adulterous relationship existed between plaintiff and him. There is no doubt that the act of adultery is still a crime in New Jersey. N.J.S.A. 2A:88-1. It is a rule of law that the doing of an unlawful act or the consequence of an unlawful act cannot be made the consideration for a contract and a contract based on such consideration is illegal and unenforceable. Duff v. Trenton Bev. Co., 4 N.J. 595 (1950).
In Vetten v. Wallace, 39 Ill. App. 390 (App. Ct. 1891), the court held that the promise of the alleged father to pay the mother for the support and maintenance of a child born after the mother married another man was void. The court reasoned that inasmuch as the child was born in wedlock between the mother and another, the promisor, if he in fact was the father, must have been guilty of adultery and the consideration for the contract therefore involved a criminal offense on the part of the party to whom the promise was made.
A court of equity cannot and should not enforce specific performance of a contract to make a will to provide for the illegitimate child where the parties violated the laws of the state in carrying out their contractual arrangement. The act of adultery cannot and should not be regarded as sufficient consideration to support a promise to make a will. Drennan v. Douglas, 102 Ill. 341 (Sup. Ct. 1882). A court of conscience cannot lend its aid to an agreement that arose out of an act of adultery.
*370 An agreement by a father to support his illegitimate child made after birth is enforceable. Crenshaw v. Gardner, 277 F. Supp. 427 (D.N.J. 1967). Such an agreement would not be tainted by the past illicit intercourse and adultery between the parties. Rather, it would be a recognition by the father of his moral and legal obligation pursuant to N.J.S.A. 9:16-2 to support his illegitimate child during his lifetime. However, this action is not brought for that purpose. The agreement sued upon here was made in part to induce plaintiff to engage in illicit intercourse and adultery with Bruno. Consequently, the agreement, at least in part, is in violation of a penal statute, N.J.S.A. 2A:88-1, and is against public policy. Therefore, the entire contract is illegal and unenforceable. Regan v. Lenkowsky, 137 F. Supp. 133 (D.N.J. 1956); Cannon v. Cannon, 26 N.J. Eq. 316 (Ch. 1875); Naseef v. Cord, Inc., supra.
It may be argued that in today's society, with its changing mores and life styles, the conduct of the parties which led to the making of this contract is such that it should not taint the contract and make it unenforceable.[1] It is significant to note that most of the changing law resulting from our modern-day social values and life styles deals with cases where both parties were unmarried. We cannot be unmindful of the fact that here one party was unmarried and the other *371 was married. Despite our changing standards of morality, the family unit is an integral part of our society and must be preserved and maintained. We cannot countenance the relationship of a married man and his mistress or lover. The mere fact that one party desires to produce a child of his own, while a noble motive, does not justify the means to that end. Even though the act of adultery may be decriminalized by legislative enactment, public policy cannot tolerate illicit relationships of this kind and any agreements arising therefrom.
Plaintiff argues that even though a contract may be based upon the commission of an illegal act, such should not invalidate the contract with respect to the child as the third-party beneficiary. There is no merit to this argument. It is a general rule of law that one not a party to an illegal contract cannot derive any benefit therefrom even though it were made in his behalf. 17 C.J.S. Contracts § 278f (1963). In First Nat'l Bank v. First Nat'l Bank, 53 S.W.2d 75 (Tex. Civ. App. 1932), error dismissed, plaintiff bank sought to take the benefits of an illegal transaction made by its president with defendant bank on behalf of plaintiff bank. The court refused to enforce the illegal transaction, stating:
If the transaction was void as being contrary to law or public policy, then the law will leave the parties where they have placed themselves, and the Stamford bank (plaintiff) cannot, for that reason recover the balance of the deposit. 10 Tex. Jur., p. 190. From the standpoint of the Stamford bank (plaintiff) it was never a party to the transaction and certainly could derive no benefit from an illegal and void contract, even if made in its behalf. [at 76-77]
The foundation of any right the third-party beneficiary may have is the promisee's contract. Therefore, any defense arising in connection with the validity of the contract is available to the promisor against the beneficiary. 2 Williston on Contracts (3 ed. 1959), § 394 at 1063. The beneficiary, in attempting to take advantage of a contract made for him by another, must make it subject to all legal *372 defenses and inherent equities arising out of the contract as between the parties thereto and must bear the burdens thereof. Duncan v. Nowell, 27 Ariz. 451, 233 P. 582 (Sup. Ct. 1925); Meyerson v. New Idea Hosiery Co., 217 Ala. 153, 115 So. 94 (Sup. Ct. 1927); Annotation, 81 A.L.R. 1271 (1932).
In this case defendants clearly are entitled to raise the defense of illegality against the enforcement of the agreement by the beneficiary child. The illegality of the consideration arising from the illicit act of intercourse and adultery by the promisee goes to the very heart of the agreement and renders it invalid in law and in equity. Any contract made in consideration of an act forbidden by law or against public policy is unenforceable and the illegality of the contract will constitute a good defense at law as well as in equity. Smith v. Southwestern Bell Tel. Co., 349 P.2d 646 (Okl. Sup. Ct. 1960). Since the illegality of the consideration renders the contract invalid and unenforceable as between the immediate parties, a court of equity cannot allow the beneficiary to enforce it for a third-party beneficiary can acquire no better right to enforce the contract than that held by the contracting parties. Simmons v. Western Assur. Co., 205 F.2d 815 (5 Cir.1953). The conclusion follows that the enforceability of this agreement by the beneficiary child is barred in toto by the defense of illegality.
In passing it should be noted that the testimony revealed that Bruno, Jr. is receiving approximately $219 a month as social security benefits by reason of the death of his father. It is presumed that these will continue in accordance with the Social Security rules and regulations. See, Social Security Act, 42 U.S.C.A., §§ 651-660 (1975). Apart from the alleged agreement, it is obvious that Bruno, Jr. is being financially provided for by reason of the father-son relationship. Plaintiff, as the mother of the child has an equal obligation to support the child. N.J.S.A. 3A:4-7. It appears *373 from the evidence that she is employed part-time and has a take-home pay of approximately $256 a month. Bruno, Jr. is presently in the seventh grade in school. Plaintiff only works about four hours a day. There is nothing to indicate why she could not be employed full-time and increase her earnings so that she might be better able to discharge her obligation to support the child.
Finally, since it is the opinion of the court that any such agreement would be unenforceable, there is no need for the court to make a factual determination as to whether such an agreement was made.
The complaint is dismissed.
NOTES
[1] See e.g., Estate of Thornton, 81 Wash.2d 72, 499 P. 2d 864 (Sup. Ct. 1972), opinion on appeal after remand, 14 Wash. App. 397, 541 P.2d 1243 (App. Ct. 1974); Omer v. Omer, 11 Wash. App. 386, 523 P.2d 957 (App. Ct. 1974), and the court's treatment of providing relief and protection for partners and children of stable nonmarital units. Many courts, while refusing to enforce express property or compensation contracts between parties to a nonmarital union on grounds that such agreements were illegal contracts for prostitution, have strained to enforce express contracts to pool property in such relationships. Annotation, 31 A.L.R.2d 1255 (1953). Legislatures have decriminalized nonmarital sexual activity. Cal. Stats. 1975, c. 71, repealing Penal Code §§ 269a and 269b, which had previously made adulterous cohabitation a criminal offense. See also, "Property Rights of DeFacto Spouses," 10 Family Law Q., 101 at 108-9 (1976).