CARLO C. GELARDI CORP., A New
Jersey Corporation, Plaintiff,

v.

MILLER BREWING COMPANY, A
Wisconsin Corporation, Defendant.

Civ. A. No. 76–824.

United States District Court,
D. New Jersey.

Dec. 11, 1980.

James R. Heaney, Morristown, N. J., for plaintiff.

Carpenter, Bennett & Morrissey by John E. Keale, Newark, N. J., Conboy, Hewitt, O'Brien & Boardman by Timothy C. Quinn, Jr., New York City, for defendant.

OPINION

HAROLD A. ACKERMAN, District Judge.

The plaintiff in this suit, Carlo C. Gelardi Corp. (Gelardi), a former distributor of Miller Brewing Co. (Miller) products, brought this suit against Miller after Miller terminated Gelardi's distributorship agreement. Gelardi's complaint alleges violations of Sections 1 & 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2, the Robinson–Patman Antidiscrimination Act, 15 U.S.C. § 13, and the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 *et seq.*, as well as breach of contract and tortious interference with business and contractual opportunity. Miller has filed a motion seeking partial summary judgment as to all but the tortious interference claims made by Gelardi. In responding to this motion, Gelardi has decided not to pursue its Sherman Act § 2 claim. It has, however, contested the remaining aspects of Miller's motion. I have decided to grant Miller's motion as to Gelardi's Sherman Act § 1, Robinson–Patman Act, and breach of contractually created exclusive territory claims. The remainder of Miller's motion has been denied.

Because this case has already been the subject of two scholarly opinions by the late Hon. George H. Barlow, it is unnecessary for me to engage in an extensive discussion of the factual background of this suit. See *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 233 (D.N.J.1976) (*Gelardi I*); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237 (D.N.J.1976) (*Gelardi II*). I will, however, discuss the facts as they are relevant to the issues under discussion in each section of this opinion.

In deciding this motion I have applied the appropriate standards required by Fed.R. Civ.P. 56. These are well–summarized by the following quotations from the Supreme Court:

We look at the record on summary judgment in the light most favorable to ... the party opposing the motion .... We believe that summary procedures should be used sparingly in complex antitrust

litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross–examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However:

To the extent that [it has been suggested] that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full–dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank of Arizona v. Cities Service Corp.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). *See also Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 579 (3d Cir. 1979). With these standards in mind, I will now discuss the specific issues raised by the defendant's motion.

### I. Sherman Act § 1

In *Gelardi II* Judge Barlow concluded, in denying an injunction to the plaintiff, that Gelardi had not demonstrated a reasonable probability of success on its Sherman Act § 1 claims. 421 F.Supp. 240–45. In that opinion Judge Barlow discussed three aspects of the plaintiff's § 1 claim, all of which are still being pressed by the plaintiff:

(1) Miller's allocation of beer products is an unreasonable restraint of trade, in violation of the Sherman Act, 15 U.S.C. § 1.

(2) Miller's establishment of a dual distributorship in the plaintiff's area of primary responsibility manifests a conspiracy to force the plaintiff out of business, in violation of the Sherman Act, *id.* §§ 1, 2;

(3) Miller's entire course of conduct toward the plaintiff manifests a conspiracy to force the plaintiff out of business, in violation of the Sherman Act, *id.*

421 F.Supp. 240–41. (footnotes omitted) In addition to these claims, it appears from the plaintiff's brief in response to this motion that the plaintiff also contends that Miller engaged in a conspiracy to fix prices, a *per se* violation of Sherman Act § 1. I will consider all of these contentions.

Although Judge Barlow was considering this case on a motion for a preliminary injunction brought by the plaintiff, while I am presently faced with a motion for summary judgment brought by the defendant, Judge Barlow's statement of the law remains the law of this case. In view of the differing posture of the case I must draw every factual inference in favor of the plaintiff, while Judge Barlow was required to objectively view the proofs and determine the plaintiff's likelihood of success. While this difference in posture requires a different approach to the facts, it does not change the applicable law and I am fortunate in having Judge Barlow's scholarly opinion to guide me through the analysis of some of the issues presented here.

■ I will, therefore, begin my decision of this case where Judge Barlow began: with a consideration of the plaintiff's claims regarding Miller's beer allocation system and particularly whether the plaintiff has set forth sufficient facts to create a genuine issue of fact as to whether a conspiracy existed. In his discussion of the allocation issue Judge Barlow set forth the following basic principle of antitrust law:

"Essential to the violation of the antitrust laws is an agreement or combination, the purpose and effect of which is restraint of trade and suppression of competition." *See Viking Theatre Corp. v. Paramount Film Distrib. Corp.*, 320 F.2d 285, 293 (3d Cir. 1963), *aff'd.*, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964); *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 418 F.Supp. 1009, at 1015 (D.N.J. 1976); *Kaiser v. General Motors Corp. (Pontiac Motor Div.)*, 396 F.Supp. 33, 38 (E.D.Pa.1975). Whatever the merits of plaintiff's argument that the Miller allocation system is an unreasonable restraint of trade, there is no evidence to indicate that the allocation system is the result of a contract, combination, or conspiracy as required by § 1 of the Sherman Act.

421 F.Supp. 241–42 (footnotes omitted). Judge Barlow reached this conclusion after conducting a hearing. I have searched the record of that hearing as well as the subsequent discovery and I have concluded that Gelardi has still failed, after four years of discovery, to produce evidence of a conspiracy or combination which has the purpose or effect of illegally restraining trade or suppressing competition. Indeed, even when the plaintiff's claims are accepted at face value without requiring support in the record, the claims fall short of stating a violation of Sherman Act § 1. It is this lack of an unlawful conspiracy that is fatal to all of the plaintiff's Sherman Act theories.

If we accept the plaintiff's claims at face value the following facts appear. Miller had for several years been dissatisfied with Gelardi, perhaps unreasonably dissatisfied, and had considered terminating its distributorship and replacing it with a different corporation. Warren Distributing Co. (Warren) was another Miller distributor that vigorously competed with Gelardi in certain parts of the region that Gelardi served. Warren's competition included hiring an unfaithful Gelardi employee who badmouthed Gelardi to the benefit of Warren and with the result that customers complained about Gelardi to Miller. In late June or early July of 1975 Gelardi reached an agreement with Warren whereby Warren would purchase a 50% interest in Gelardi. The president of Warren advised Miller of this proposed deal and Miller responded with a telegram to Gelardi which said that the deal could not be completed unless and until Miller approved it and that Miller would not have sufficient time in which to consider the deal before the intended date of closing the deal. Shortly thereafter Miller summoned Warren's president to Milwaukee, where Miller's headquarters is located, and when Warren's president returned to New Jersey he was in possession of a distributorship agreement with Miller that gave Warren the right to distribute Miller products in the same area that Gelardi was authorized to distribute within. This new distributorship agreement with Warren was contrary to Miller's contract with Gelardi which gave it an exclusive area of distribution. The resulting dual distribution area was virtually unique among Miller distributors. During the time that this dual distributorship was in effect Miller continually treated Warren better than it treated Gelardi. This was reflected, in particular, by Miller's giving Warren more favorable credit terms that it was giving to Gelardi, by Miller's giving Warren more beer than it was giving to Gelardi, and by delivering beer to Warren by more direct railroad routing than was used in delivering beer to Gelardi. During the period of the dual distributorship a destructive price war was waged between Warren and Gelardi. In April of 1976 the dual distributorship ended when Gelardi signed, in exchange for $420,000.00, an agreement not to compete with Warren. Thereafter, Miller terminated its distributorship agreement with Gelardi contending that Gelardi had breached its contract with Miller by agreeing not to serve the area that it had promised to serve in its contract with Miller.

█ Now it should be emphasized that the facts that I have just related do not necessarily find support in the record, but simply represent Gelardi's version of the facts which I am using as a base for this

Sherman Act § 1 analysis. The facts as related also contain legal conclusions that may not be validly derived from the record or the law. In particular, the facts related state that Miller breached its contract with Gelardi by setting up a dual distributorship for Miller products in Gelardi's exclusive territory. It is extremely doubtful that the law would support a conclusion of breach of contract since in 1975, when the alleged breach of contract occurred, exclusive territorial agreements were considered to be a *per se* violation of the Sherman Act. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1965) *overruled Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Nevertheless, in order to give Gelardi the benefit of every inference that it may be entitled to under Rule 56 standards I have even accepted for purposes of the Sherman Act § 1 analysis Gelardi's assertion that Miller breached its exclusive territorial agreement.

Even under these facts Miller's conduct does not violate the antitrust laws.

> [I]t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A.

*Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir. 1972) *citing Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969) *cert. denied* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Nor does the fact that a breach of contract is involved transform such conduct into a violation of the antitrust laws. As Judge Barlow held in *Gelardi II*:

> The fact that Miller's actions had an adverse impact upon the plaintiff's business does not, by itself, amount to a violation of the Sherman Act. Damage alone does not constitute liability under the Act. . . . A conspiracy which results merely in the substitution of one distributor for another does not violate § 1 . . . . Nor is an increase in the number of distributors actionable under § 1 . . . . The elimination of the plaintiff's distributorship would violate § 1 only if, in fact, it constituted a restraint of trade or was motivated by an anti–competitive intent.

421 F.Supp. 242–43 (citations omitted). It is clear, then, that unless it was motivated by an unlawful intent in violation of the Sherman Act Miller would not have violated the Sherman Act even if it had taken more drastic actions against Gelardi than those it is alleged to have taken: absent unlawful intent, Miller could have cut off Gelardi's distributorship without notice in July 1975 and put Warren in its place. In fact Miller did less than that. Miller allowed Gelardi to remain in business until Gelardi sold its rights to Warren. If Miller had cut Gelardi off in July 1975, Gelardi would not have gotten a dime from Warren. It was only because Miller permitted Gelardi to remain in business that Gelardi's covenant not to compete was worth the not inconsiderable sum of $420,000.00 to Warren. Since some money is always better than none, Miller's actions were clearly less damaging to Gelardi than a complete cutoff would have been and did not, in and of themselves, violate the Sherman Act. *Franklin Music v. American Broadcasting Co.*, 616 F.2d 528 at 542 (3d Cir. 1979).

The only question to be decided then is whether Gelardi has shown sufficient facts from which it could be inferred that Miller had an unlawful intent in violation of the Sherman Act. In this regard Gelardi argues that any or all of three possible unlawful intents may be inferred:

(1) Miller ws engaged in a conspiracy with Warren in furtherance of Warren's effort to drive competing distributors, like Gelardi, out of business.

(2) Miller was engaged in a conspiracy with Warren in furtherance of Miller's efforts to prevent other beers from competing with its products more vigorously through using Gelardi as a distributor of their products as well as of Miller products.

(3) Miller was engaged in a conspiracy with Warren in furtherance of a price–fixing scheme for Miller products.

Because the facts cannot support any of these inferences, Miller's motion for summary judgment on the § 1 claims will be granted.

The Third Circuit, in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir. 1979), recently considered a theory like the one put forth by Gelardi in its first argument of unlawful intent. In *Cernuto* the court wrote that

> When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be .... When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints .... However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer level.

595 F.2d 168 *as quoted in Mannington Mills v. Congoleum Industries, Inc.,* 610 F.2d 1059, 1070 (3d Cir. 1979). It is clear, then, that if Gelardi could show that Warren was the source of pressure that caused Miller to take its actions against Gelardi then it would be able to demonstrate a violation of § 1. In *Cernuto* the Third Circuit reversed the entry of summary judgment because the defendants had assumed for purposes of their motion that their conduct had been motivated by the complaints and wishes of one of the plaintiff's competitors. See 448 F.Supp. 1332 at 1334 (D.C.Pa.). Here, however, Miller vigorously denies that its ac-

tions were anything other than unilateral and the plaintiff's proofs fail to demonstrate the contrary.

All that Gelardi has demonstrated is that Miller took actions against it that Gelardi did not like and that Warren in some ways benefitted from those actions. It is obvious that the mere fact that a competitor might benefit from actions taken by a manufacturer against one of its distributors does not demonstrate that the action occurred as a result of pressure from the competitor. The plaintiff has produced nothing to support its allegation that Warren pressured Miller into giving Gelardi a tough time. To the contrary, Gelardi's own version of the facts demonstrates that Miller was giving Gelardi a hard time, and considering replacing Gelardi with another distributor, long before Warren's supposed involvement in the conspiracy. The only facts that might, at first glance, support an inference that Warren triggered a conspiracy are Warren's telephone call to Miller and the meeting in Milwaukee. The telephone call, however, was simply in compliance with the distributorship agreement that both Gelardi and Warren had with Miller. That agreement states in paragraph 3 that

(b) Distributor may assign this Agreement providing Distributor obtains Miller's prior written consent to such assignment. Unless Miller so consents neither this agreement or any of the rights of Distributor hereunder shall be transferred or assigned, whether by operation of law or otherwise, to any other person, firm association or corporation, and any attempted transfer or assignment of this agreement or of any of the rights of Distributor hereunder without Miller's written consent shall be absolutely void and unenforceable.

(c) If distributor is a corporation no change shall be made in either the record or beneficial ownership of 10% or more of the stock of Distributor or in any of the principal officers or directors [as designated on Distributor's Data Sheet] of Distributor without the prior written consent of Miller

and if any such change will be made without such prior written consent Miller shall have the right at any time thereafter to terminate this agreement by giving written notice of such termination to Distributor.

Warren cannot be viewed as prodding Miller into action when all it did was notify Miller of a proposed transfer of ownership of 50% of Gelardi's stock as it was required to do by the contract. Nor can Miller's immediate response to the telephone call support an inference of pressure placed upon Miller by Warren. Miller responded with a telegram to Gelardi, reading as follows:

We were advised today by Mr. Frank Banko [the president of Warren] that you had contacted him this morning and offered to sell to him 50% of the corporate stock of your company. Furthermore, you apparently stated that in the event Mr. Banko did not indicate to you today that he was willing to purchase such stock, you intended to make a definite agreement with somebody today and that if Mr. Banko did not purchase the stock, you would enter into an agreement to sell the stock to Mr. Joseph DeMarco of North New Brunswick, N.J. and that such agreement would be entered into probably today. We wish to draw your attention to paragraph 3(c) of our agreement dated May 1, 1968 wherein it states that any change in the record or beneficial ownership of 10% or more of the stock of your company without the prior written consent of Miller Brewing Company grants to Miller Brewing Company the right to terminate such agreement.

Although we have not received an actual request for approval of such stock transfer from you directly, Mr. Banko indicated that he had informed you that he was going to contact us and advise us of his conversation with you. Therefore we are interpreting this as your request for approval of such stock transfer. We are unable on such short notice to properly evaluate the proposed transaction. Therefore, we cannot give you today the necessary approval or disapproval called for by our agreement. This matter will require some study and evaluation in detail.

Inasmuch as you are currently conducting negotiations with Mr. Banko and at least one other party for a sale of 50% of your corporate stock, please submit to us, in accordance with our agreement, a written request for our approval of such a stock transfer, and within a reasonable time thereafter we will be in a position to advise you whether or not such a transfer would be approved.

We are sending a copy of this wire to Mr. Banko to confirm our conversation with him today.

This telegram can only be read as a reasonable response to a proposed sale of Gelardi stock. In it, Miller simply reminds Gelardi of Miller's contract rights and requests a reasonable amount of time to study the deal. Nothing in the telegram suggests that approval would be unreasonably withheld, nor does anything suggest that Warren has urged Miller to cancel the deal. To the contrary, the telegram gives one the impression that Warren's president would like to see the deal go through.

Finally, there is no evidence that Warren courted the invitation to Milwaukee. The evidence only shows that Warren's president was summoned to Milwaukee where Miller made him an offer of a dual distributorship that he chose to accept.

I imagine that it would be possible to conceive of a plot hatched by Warren that could contain all of the contacts with Miller that appear in the evidence. But to do so would be to engage in wild speculation that is not supported by the evidence rather than to engage in reasonable inferences drawn from the evidence. Moreover, Gelardi has produced nothing that suggests that Warren was in any position to pressure Miller into doing anything. Warren never threatened to pull out of the Miller distribution system, for example, nor does it appear that Warren had enough market force to make demands upon Miller. I have concluded, therefore, that Gelardi has, at best,

produced a scintilla of evidence supporting the existence of pressure from Warren causing Miller to act against Gelardi. Gelardi certainly has not produced "significant probative evidence to support the complaint." *First National Bank of Arizona, supra.*

The record is similarly lacking in evidence to support an inference that Miller and Warren acted together with the purpose of preventing other beer manufacturers from using Gelardi as a distributor for their products. First of all, there is no evidence that Warren ever conspired with Miller or entered into any sort of agreement with Miller that had such a purpose. All that Warren did was accept terms offered to it by Miller and eventually enter into a covenant not to compete with Gelardi whereby Gelardi signed away its right to distribute Miller beer. Significantly, the covenant not to compete only applies to Miller products and not to products from any other manufacturer. Second of all, there is absolutely no evidence in the record that suggests that Miller ever contacted any other brewer in an attempt to prevent it from selling its products through Gelardi. Nor has it been shown that Gelardi ever ceased handling or refused to handle a competing product due to Miller pressure. The best piece of evidence that Gelardi has been able to muster in support of this claim is a letter sent to it by Miller during the period of the dual distributorship on October 28, 1975. That letter states:

> We have been advised that in the near future you will commence distribution of Olde English Malt Liquor in addition to the brands you are now distributing. As an independent businessman, you obviously have the right to add or eliminate brands at your discretion.
>
> On the other hand we must be concerned about the effect this will have on your distribution of Miller brands. We are concerned that this may cause a dilution of your effort. Therefore, we are interested in knowing the specifics of how this brand addition will affect your overall marketing program on the Miller brands: i. e. manpower, time allocation, physical property, etc.

> We certainly expect you to continue to fulfill the obligations to Miller which you assumed in our distributorship agreement. Should you become unable to fulfill such obligations, we will have to consider what action we must take.
>
> Please advise me as soon as possible as to the specific changes you will have to make in the distribution of Miller brands.

Even if this letter is inferred to constitute proof of undue pressure placed upon Gelardi by Miller, nothing in the letter supports an inference of conspiracy or any other involvement of Warren or anyone else in Miller's actions. Moreover, some of Miller's own actions are contrary to actions that one would take in support of a plan to prevent Gelardi from distributing other brands. By terminating Gelardi as a distributor, Miller made Gelardi, with its warehouses, trucks, staff, etc., available to work full time in the promotion of other brands. Miller's actions may have also given Gelardi a motive to vigorously compete with the Miller brands because of anger over the treatment it received from Miller. Once again, I can only conclude that Gelardi has not produced sufficient evidence to support this § 1 theory against Miller.

█ Finally, Gelardi suggests that a price fixing conspiracy existed. After reading Gelardi's briefs, however, I am at a loss to understand what prices it contends were fixed and what mechanisms it contends were employed by Warren and Miller in furtherance of the purported price fixing scheme. The best guess that I can make is that Miller and Warren engaged in price fixing because different credit terms were given to Warren and Gelardi. I make this guess because of the plaintiff's reliance on the Supreme Court's recent decision in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). Although the plaintiff describes this case as coming "down squarely on credit as a per se violation of the Sherman Act," I am at a loss to discover either the holding that the plaintiff claims the case reached or any

relevance of *Catalano* to the price fixing issue in the present case. *Catalano* simply held that when competing wholesalers agree to fix the terms of credit that is offered to purchasers, they have engaged in illegal price–fixing which constitutes a *per se* violation of the Sherman Act. Aside from the fact that *Catalano* makes it clear that credit is an element of price, it does nothing to suggest that the use of credit is in and of itself a violation of the act. Indeed it suggests the opposite, that for Sherman Act purposes different applicants for credit are best treated differently in accordance with their credit worthiness and the individual creditor's willingness to accept risks. In the present case Gelardi has not presented any proof of Warren's participation in any of Miller's credit decisions nor has it shown any other outside participation in its credit decisions, therefore, it clearly cannot survive summary judgment on this theory.

█ Another possible price fixing theory may be derived from Gelardi's emphasis of the fact that Warren engaged in what Gelardi has characterized as "predatory price discounting" during the period of the dual distributorship and that Warren's prices went up after Gelardi signed the covenant not to compete. While this demonstrates the benefits to consumers when there is competition in the distribution of a product line, and the detriment to consumers when that competition is eliminated, it does not demonstrate a conspiracy to fix prices. Nothing in plaintiff's proofs shows a uniformity in the distributor's price of Miller that Gelardi had broken ranks with, so that it would be punished by Miller and Warren. Nor does anything show that, after Gelardi agreed not to compete, Warren raised its prices to a fixed distributor's price pursuant to a conspiracy with Miller. All that is shown is that Warren did its best to compete with Gelardi during the period of the dual distributorship and that Warren took advantage of Gelardi's ending of competition by raising its prices. The proofs show rational business behavior on the part of Warren, they do not support an inference of price fixing.

Having rejected all of Gelardi's Sherman Act § 1 theories I have decided to grant Miller's motion for summary judgment on those claims.

II. The Robinson–Patman Act

The plaintiff argues that Miller has violated the Robinson–Patman Act, 15 U.S.C. § 13, in three ways:

(1) Miller sold beer to Warren on better credit terms than it gave to Gelardi, in violation of 15 U.S.C. § 13(a).

(2) Miller shipped beer to Gelardi over circuitous rail routes, in violation of 15 U.S.C. § 13(a) & (e).

(3) Miller supplied more beer to Warren than it supplied to Gelardi, despite Gelardi's attempts to obtain more beer, in violation of 15 U.S.C. § 13(e).

In deciding to grant Miller's motion for summary judgment on these claims I have drawn every factual inference in favor of Gelardi, as required by Fed.R.Civ.P. 56. *See First National Bank of Arizona v. Cities Service Corp., supra; Poller v. Columbia Broadcasting System, Inc., supra.* When such inferences are made it can be said that Miller did in fact provide better credit terms and more beer to Warren than it provided to Gelardi. It may also be said that Miller shipped beer to Gelardi over unnecessarily circuitous rail routes. Nevertheless, even when the facts are viewed favorably to Gelardi, Gelardi has failed to demonstrate a violation of the Robinson–Patman Act.

In *Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. 4 (E.D.Pa.1977), a case heavily relied upon by the plaintiff, Judge Ditter explained the basic prohibition of the Act:

[T]he Robinson–Patman Act prohibits comprehensively a seller's discrimination, either direct or indirect, between different purchasers of like commodities where the effect of such discrimination may substantially lessen competition, create a monopoly, or injure, destroy or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination. In particular, this

prohibition extends to price (subsection a), . . . and the furnishing of services in connection with the processing, handling, or sale of commodities (subsection e). *Id.* at 8. The legislative history of the Act and the cases interpreting it have made it clear, however, that the Act does not prohibit all forms of discrimination among customers but only those that relate to price or that serve as disguised price discrimination. For an authoritative discussion of this proposition see Judge Morton's opinion in *Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819, 848–53 (M.D.Tenn.1974). It is, therefore, necessary to closely analyze any claimed violation of the Act in order to determine whether the defendant's actions were, in fact, of the sort that violated the Act. *Id.* at 850. I will, therefore, consider each of the plaintiff's three arguments separately, beginning with the differences in credit extended to Gelardi and Warren.

In *Gelardi II* Judge Barlow concluded that Gelardi had not demonstrated a reasonable likelihood of success on its discrimination in credit theory. 421 F.Supp. 246. As I noted earlier, Judge Barlow reached this decision through the application of a different evidentiary standard from the one that I must apply on a motion for summary judgment. His statement of the law nevertheless remains the law of this case. In *Gelardi II* Judge Barlow set forth some of the basic elements necessary to any Robinson–Patman claim. In this regard Judge Barlow noted that "An essential element in a price discrimination case is that there exists competition between the disfavored customer and the favored customer(s)." 421 F.Supp. 245 (citations omitted). Judge Barlow concluded that "There is nothing in the record to indicate that the plaintiff has been in competition with any . . . distributors, except for Warren. Thus the only relevant differential is that between the plaintiff and Warren." 421 F.Supp. 246. The record before me remains devoid of any indication that Gelardi was ever in competition with any distributor whose credit record has been developed in discovery other than Warren. In particular, although there is some evidence that

Gelardi was in occasional competition with a Miller distributor that serviced the Trenton, N.J. area, no credit history of that distributor has been presented to the court. I, therefore, share Judge Barlow's conclusion that "the only relevant differential is between the plaintiff and Warren." *Id.*

I conclude that the plaintiff has shown, for summary judgment purposes, an extreme difference in credit terms between itself and Warren. Gelardi was required to pay for its beer in advance while Warren was permitted to finance its purchases. This difference obviously forced Gelardi to invest more cash in the purchase of beer than Warren was required to invest. Although some doubt has been expressed by various courts in the past as to whether credit is an element of price for purposes of 15 U.S.C. 13(a), I am satisfied that discrimination in credit terms can amount to price discrimination in violation of that subsection. *See Catalano, Inc. v. Target Sales, supra; Robbins Flooring, Inc. v. Federal Floors, Inc., supra.* Nevertheless, I share with previous courts the view that not all discrimination in credit terms amounts to a violation of the Act.

It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under these circumstances.

*Craig v. Sun Oil Co. of Pennsylvania,* 515 F.2d 221, 224 (10th Cir. 1975) *quoted in Gelardi II,* 421 F.Supp. 246. In other words, a manufacturer is free to extend different terms to competing purchasers so long as it makes its decisions in a non–discriminatory manner, i. e., the same standards of credit worthiness must be extended to all applicants for credit who are in competition with each other. A showing such as the one made by Gelardi in this case can, therefore, be rebutted by an "affirmative showing that the different terms resulted from legitimate business factors." *Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. at 9.

■ In the present case Miller has come forward with evidence demonstrating significant problems it has had with Gelardi due to past extensions of credit and has also come forward with evidence demonstrating that it has had no such problems with Warren. Fed.R.Civ.P. 56(e) requires Gelardi to meet this evidence by producing evidence from which it could be inferred that Warren's credit history was comparable to Gelardi's credit history and that Warren, therefore, was not entitled to better treatment from Miller than Gelardi under neutral non–discriminatory standards of credit worthiness. This could have been done in two ways. Gelardi could have shown either that its credit history was not as bad as Miller says that it was or that Warren's credit history was not as good as Miller says it was. Unfortunately for Gelardi, it has produced no evidence from which either of those conclusions can be inferred. Since Warren is the only relevant distributor for comparison under the Robinson–Patman Act, Gelardi's effort to demonstrate that distributors in other parts of the country who had credit histories comparable to Gelardi's received better treatment from Miller is irrelevant. *Gelardi II*, 421 F.Supp. at 246. Because Gelardi has not presented "any significant probative evidence" in response to Miller's "affirmative showing that the different terms resulted from legitimate business factors," Miller's motion for summary judgment on this claim must be granted. *See First National Bank of Arizona v. Cities Service Corp.*, 391 U.S. at 290, 88 S.Ct. at 1593; *Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. at 9.

■ For similar reasons, Miller's motion for summary judgment must be granted as to Gelardi's second Robinson–Patman theory. Although Gelardi has shown, for summary judgment purposes, that its beer was shipped *via* circuitous rail routes, it has not shown that Warren's beer was shipped any differently. Absent a showing of discrimination by Miller between competitors no Robinson–Patman claim can be made out. Since no discrimination has been shown with regard to the routing of beer, Gelardi's claim in this regard must fail.

■ Gelardi's final contention is that Miller violated 15 U.S.C. § 13(e) by making more beer available to Warren than it made available to Gelardi. Gelardi has shown, for summary judgment purposes, that Warren received more beer from Miller than Gelardi received at a time that both were attempting to purchase beer from Miller. I have concluded, however, that offering different amounts of a product for sale to different customers does not constitute a violation of 15 U.S.C. § 13(e).

Section 13(e) prohibits a very particular type of conduct. Subsection (e) makes it unlawful for a seller

> to discriminate in favor of one purchaser against another purchaser . . . of a commodity bought for resale . . . by . . . furnishing . . . any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionately equal terms.

15 U.S.C. § 13(e); *see F.T.C. v. Simplicity Pattern Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959). Unlike other portions of the Robinson–Patman Act, proof of a § 13(e) violation "does not depend upon competitive injury or the absence of a cost–justification defense." *Great A & P Tea Co. v. F.T.C.*, 440 U.S. 69, 79, 99 S.Ct. 925, 932, 59 L.Ed.2d 153 (1979) *citing F.T.C. v. Simplicity Pattern Co.*, 360 U.S. at 67, 79 S.Ct. at 1012.

In *Cecil Corley Motor Co. v. General Motors Corp., supra*, the court considered a § 13(e) claim very similar to the one presented in the present case. As in the present case, the *Cecil Corley* plaintiff claimed that it was not receiving fair treatment from its supplier in terms of the allocation of supplies and the timeliness of deliveries. In a scholarly opinion, the reasoning of which is incorporated herein, Judge Morton discussed the history of the subsection and the many cases decided thereunder and concluded that such discrimination does not constitute a violation of the Act. I share Judge Morton's conclusion. The following is a portion of his reasoning:

The Robinson–Patman Act was intended to end direct and indirect price discrimination in the sale of products of like grade and quality sold in interstate commerce for the purposes of resale. Among those "services and facilities" held to be within sections [13](d) and [13](e) have been any kind of advertising, catalogs, demonstrators, displays and storage cabinets, display materials, hand bills, special packaging or package sizes, warehouse facilities, accepting returns for credit, prizes or merchandise for conducting promotional contests, and "monetary awards" paid by the seller to clerks, salesmen, and other employees of the customer for special sales or promotional efforts.

On the other hand, the Act is not all–encompassing, and does not provide relief against every form of unfair or inequitable treatment of customers. It does not, for example, reach what arguably is the most extreme discrimination of all: namely, a total refusal to even deal with a particular individual or class of customers. As the Fifth Circuit said in *Skinner v. United States Steel Corp.*, 233 F.2d 762 (5th Cir. 1956), when it held that withholding from its employees' wages amounts owing by its employees to a wholly–owned customer of the supplier, but not affording the same service to other customers of the supplier did not come within the meaning of Section [13](e):

> "The prohibition of Section [13](e) is not against every discrimination, nor even against every discrimination in the course of interstate commerce.
>
> .    .    .    .    .
>
> The language is neither complex nor are the words technical. Neither the legislative history nor the judicial interpretation of the quoted words [services or facilities] requires us to depart from their literal meaning.
>
> . . . In other words, the services or facilities that must be made available on proportionately equal terms to all purchasers in competition are merely merchandising services or facilities."
>
> *Id.* at 765, 766.

Other practices held not to be within the prohibitions of Section [13](e) have included a supplier's offering favorable credit terms or authorizing the extension of credit to select customers, [citations omitted]; a supplier's offering favorable real estate transactions and terms of financing to a distributor, [citation omitted]; a supplier's denial to disfavored customers of the privilege of purchasing produce in car lots at a freight terminal rather than at public auction, [citation omitted]; and a supplier's refusal to deal in part of its line of merchandise with one customer while dealing in all of its lines of merchandise with other customers, [citation omitted].

From the decided cases, it is apparent that the prohibitions of Section [13](e) of the Robinson–Patman Act provide only that the seller shall not grant "services or facilities" relative to advertising, promotions or merchandising with respect to goods of like grade and quality to a purchaser for resale of such commodities unless he makes such services or facilities available to all of his purchasers for resale on a proportionately equal basis. Since promotions, advertising or merchandising services are not at issue in this case, this court holds that Section [13](e) does not apply to this factual situation. This court concludes that allocations and timeliness of delivery of product are not within the purview of Section [13](e).

*Cecil Corley*, 380 F.Supp. at 850–51.

In the present case Gelardi claims that Miller held it to an allocation system that it employed in a discriminatory manner insofar as it provided beer to Warren outside of the allocation system. This is a discrimination in supply and willingness to sell. It is not a discrimination in "services or facilities" and is not, therefore, illegal under § 13(e). Indeed Miller's discrimination in this manner had no effect in cost to Gelardi. Gelardi paid the same price as Warren per case of beer, it was simply permitted to buy fewer of them. There is no allegation that Warren received any services or facilities

that were not proportionately provided to Gelardi.

Insofar as the plaintiff has relied upon *Centex–Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir. 1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972), in support of its different view of § 13(e) it is clear that its reliance has been misplaced. The holding of that case was recently described by the Seventh Circuit, the same court that rendered the opinion, as follows: "*Centex Winston* held that furnishing consistently timely delivery services to a disfavored purchaser constitutes discrimination in the furnishing of a 'service' under § [13](e)." *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 617 F.2d 468, 472 (7th Cir. 1980). *Centex Winston* simply had nothing to do with the availability of the manufacturer's product, it simply discussed the speed of delivery of that product. It is clear, therefore, that *Centex–Winston* is inapposite to Gelardi's theory that there was illegal discrimination due to differences in the availability of beer to Warren and Gelardi. *Centex–Winston* may be apposite to Gelardi's theory that Miller shipped its beer to Gelardi over circuitous rail routes but, as I have previously indicated, it has failed to make any showing that Miller treated Warren differently in this regard. It is not, therefore, necessary for me to consider whether *Centex–Winston* was properly decided.

In sum, I have rejected all of Gelardi's theories of Miller's alleged violation of the Robinson–Patman Act. In so doing, I have given Gelardi the generous reading of its evidence that it is entitled to under Fed.R. Civ.P. 56, but I have found that evidence insufficient to survive Miller's motion for summary judgment on those claims. Summary judgment will, therefore, be granted to Miller on those claims.

■ It may be that Gelardi was damaged by Miller and that Miller's conduct eventually drove Gelardi out of business. But that fact, standing alone, does not make out a violation of the antitrust laws, no matter how much the plaintiff may wish it to. In this regard, it has been said that

As a general proposition, the antitrust laws exist "to protect competition, not competitors." This means that a company is entitled to sell or not to sell to any customer, or to sell as much as it sees fit, unless such actions are accompanied by unlawful discrimination within the meaning of Section 2 of the Clayton Act, as amended by Section 1 of the Robinson–Patman Act, 15 U.S.C. § 13 .... Thus, it is not necessarily a violation of the antitrust laws when a supplier allocates, or in any other way attempts to exercise control over which of its customers will receive how many of its products.

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 371 F.Supp. 701, 709 (S.C.N.Y.) *aff'd.* 493 F.2d 1352 (2d Cir. 1974), (citations omitted).

### III.  Breach of Contract

In the preceding two sections of this opinion I have decided questions of federal law. The remaining portions of the defendant's motion for partial summary judgment involve questions of New Jersey law, namely the plaintiff's breach of contract and New Jersey Franchise Practices Act claims. In *Gelardi II* Judge Barlow held that the court had jurisdiction over these state law questions because they were properly pendent to Gelardi's federal claims. 421 F.Supp. 237 n. 3. In so holding Judge Barlow noted that these claims could not be brought under the court's diversity jurisdiction because one of the individual defendants, William D. Mickey, appeared to be a citizen of New Jersey, as was the plaintiff. *Id.* If Mr. Mickey were still a party to this lawsuit, I would probably be required to dismiss the plaintiff's remaining claims due to lack of subject matter jurisdiction since in the preceding portions of this opinion I have decided to grant summary judgment to the defendant on all of the plaintiff's federal claims. *See Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–97 (3d Cir. 1976). This court cannot properly

decide state law disputes between non–diverse parties. The plaintiff, however, dropped its claims against all of the individual defendants at the pretrial conference. Pretrial Order ¶ 8, filed May 18, 1979. In the present stance of the case, then, there is complete diversity between the parties, a New Jersey corporation plaintiff and a Wisconsin corporation defendant. Under the circumstances this court has diversity jurisdiction over the state law questions and will decide them. *See Beeler v. United States,* 338 F.2d 687 (3d Cir. 1964).

The complaint sets forth two breach of contract counts and the defendant is seeking summary judgment on both. In Count Four the plaintiff alleges that the defendant breached its contract by terminating Gelardi's distributorship agreement. In Count Five the plaintiff alleges that the defendant breached its contract by creating the dual distributorship of Warren and Gelardi in Gelardi's "area of primary responsibility" as defined by the contract. I will discuss each of these counts separately, in the order pled.

▇▇▇▇ Miller argues that it is entitled to summary judgment on the termination issue because it only terminated Gelardi's distributorship after Gelardi had signed a covenant not to compete with Warren in Gelardi's "area of primary responsibility." Miller argues that by signing this covenant Gelardi breached one of its essential obligations under the distributorship agreement, namely its duty to distribute Miller products in its "area of primary responsibility," and that Gelardi's breach of this obligation gave Miller the right to terminate the distributorship agreement. Although the defendant has only cited federal court decisions in support of this proposition, it is a principle of New Jersey law that "Where one party has been guilty of a breach of essential obligations the other party has the right to deem itself discharged from further performance." *Frank Stamato & Co. v. Borough of Lodi,* 4 N.J. 14, 21, 71 A.2d 336 (1950). It may be that this principle will eventually control the decision of this case and result in a verdict in Miller's favor, but

I have concluded that Gelardi has made a sufficient showing that Miller's conduct forced it to relinquish its "area of primary responsibility" to Warren to withstand summary judgment on the termination issue.

▇▇▇ Gelardi claims that Miller's conduct of treating Warren in a more favorable manner than it treated Gelardi was undertaken to force Gelardi to end its relationship with Miller. According to New Jersey law, "In every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'" *Association Group Life, Inc. v. Catholic War Veterans of the United States,* 61 N.J. 150, 153, 293 A.2d 382 (1972) (citations omitted). Although Gelardi has not articulated its claim in terms of this covenant, I believe that it applies to the present case. When every inference is drawn in Gelardi's favor it appears that Miller employed a variety of means in order to get Gelardi out of the business of distributing Miller beer. These means have been mentioned earlier, both in this opinion and in *Gelardi II,* so they need not be detailed again. Miller's efforts to discourage Gelardi from continuing as a Gelardi distributor constitute, when every inference is drawn in Gelardi's favor, a breach of the covenant of good faith and fair dealing. Miller was not trying to make the contract work, it was trying to make Gelardi's business difficult. Once Miller breached this covenant it was Gelardi that had the right, under the *Stamato* case, *supra,* "to deem itself discharged from further performance," and if Gelardi could convince Warren to pay for Gelardi's ceasing performance of its contract with Miller, so much the better for Gelardi.

In short, under New Jersey law Miller did not have the right to make conditions so bad for Gelardi that it had no choice except to terminate its contract with Miller. If that is what happened then Miller cannot successfully justify its termination of the

distributorship agreement upon the covenant not to compete because Miller must be viewed as having terminated the contract through breach of the covenant of good faith and fair dealing before the covenant not to compete was ever signed. The defendant's motion for summary judgment on this count must, therefore, be denied. Before closing this portion of the opinion, however, I would like to note that if Miller can prove that all of its actions towards Gelardi were motivated by good faith business reasons, such as Gelardi's problems in paying for the beer it received from Miller, then the mere fact that several of these good faith decisions created difficulties for Gelardi, eventually forcing Gelardi to abandon its "area of primary responsibility," would not constitute a breach of this covenant. Gelardi must prove that Miller did not employ good faith and fair dealing in its relationship with Gelardi before it can prevail on this claim. It must also show that Miller's conduct forced its hand in signing the covenant not to compete. Otherwise, Miller was within its rights to terminate Gelardi after Gelardi abandoned its "area of primary responsibility." On the present record there is no material dispute over the fact that Gelardi's service of its "area of primary responsibility" was an essential obligation of the contract.

▪ Although I have decided to deny Miller's motion for summary judgment on Gelardi's first breach of contract theory, I have decided to grant its motion insofar as Gelardi's claim that Miller breached the agreement by creating a dual distributorship is concerned. Gelardi has argued that, although the language of the contract is ambiguous in this regard, Miller's past practice and the custom and usage of the beer distribution business establish that Gelardi's "area of primary responsibility" was, in actuality, an exclusive area. Under the New Jersey cases courts may properly consider a wide range of evidence in aid of interpretation of a contract. *E. g., Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652 (1953). When all such evidence is considered and when every inference is drawn in Gelardi's favor it may be that I

would have to conclude that Gelardi's agreement with Miller created an exclusive territory, as Gelardi contends.

▪ The only problem with the plaintiff's argument is that such an exclusive territorial agreement was illegal *per se* in 1975, the year that Miller allegedly breached the territorial agreement. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1965). Although the *Schwinn* case was overruled two years later in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), it was the law of the land at all times relevant to the present case. The law of New Jersey has long been clear that a contract creating an unreasonable restraint of trade will not be enforced. *E. g., Irving Investment Corp. v. Gordon*, 3 N.J. 217, 69 A.2d 725 (1949). Moreover, in New Jersey, "It is well established that illegal contracts are unenforceable." *Naimo v. La Fianza*, 146 N.J.Super. 362, 368, 369 A.2d 987 (Ch.Div.1976) (citations omitted). Accordingly, the contract interpretation that Gelardi seeks to enforce is unenforceable because both at the time the contract was made and at the time it was allegedly breached an exclusive territorial restriction was considered to be an illegal and, therefore, unreasonable restraint of trade *per se*. Miller's motion for summary judgment as to Count Five must, therefore, be granted.

## IV. The New Jersey Franchise Practices Act

Originally this case presented three alleged violations of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.* The first of these claims was that Miller failed to comply with the Act's requirement of sixty days notice in advance of termination of a franchisee by a franchisor, N.J.S.A. 56:10-5. This aspect of the case was the subject of Judge Barlow's decision in *Gelardi I.* For the reasons stated in that opinion Judge Barlow issued an injunction requiring Miller to comply with the notice requirement and to continue Gelardi's dis-

tributorship until the requirements of that statute had been met. 421 F.Supp. 236. Miller complied with that court order and, as a result, Gelardi no longer presses this claim for the simple reason that it has become moot. Gelardi continues, however, to press its two other claims, namely that Miller violated N.J.S.A. 56:10–5 by terminating Gelardi "without good cause" and that Miller violated N.J.S.A. 56:10–7(e) by imposing "unreasonable standards of performance upon" Gelardi. In the present motion Miller has moved for summary judgment on both of these claims.

In *Gelardi II* Judge Barlow considered both of the plaintiff's remaining claims. 421 F.Supp. 246–48. In that opinion he concluded that Gelardi had not demonstrated a substantial likelihood of success on either of the claims. Judge Barlow, however, was not required to draw every inference in favor of Gelardi in deciding not to grant an injunction. I am faced with a motion for summary judgment in which every such inference must be drawn in Gelardi's favor. Accordingly, I have decided that these claims survive summary judgment.

Miller argues that it had "good cause" to terminate Gelardi's distributorship because of the covenant not to compete that Gelardi had signed with Warren. Although this question now appears in a statutory context, it is really no different from the common law breach of contract question that I discussed in the preceding section of this opinion. If Miller can prove its version of the facts then I believe that it is correct in its argument that Gelardi's failure to continue serving its primary area of responsibility constitutes good cause for termination under the Franchise Practices Act. If, however, Gelardi can prove the set of facts that appears when every inference is drawn in its favor then it may establish that its distributorship was terminated as a practical matter when Miller breached its covenant of good faith and fair dealing. When each inference is drawn in Gelardi's favor, Miller has not presented good cause for the breach of this implied covenant.

The New Jersey Franchise Practices Act, in order to provide any sort of meaningful protection to franchisees, must be viewed as preventing franchisors from terminating franchises without good cause as a practical matter as well as by formal notices of termination. A franchisor is not permitted to accomplish a termination by indirect means that it would not be permitted to accomplish by direct means. *See Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973). Accordingly, Miller's motion for summary judgment on this claim is denied.

As to the remaining claim, N.J.S.A. 56:10–7(e) prohibits a franchisor from imposing "unreasonable standards of performance upon a franchisee." When every inference is drawn in Gelardi's favor it appears that Miller's conduct towards Gelardi made Gelardi's business life sufficiently miserable that Gelardi was forced to quit its distribution of Miller products in its primary area of responsibility. While any given action of Miller may not have violated this statutory prohibition the cumulative effect amounted to imposing an unreasonable standard of performance insofar as Miller expected Gelardi to perform at all under the adverse conditions that Miller had created. Once again the analysis is similar to the breach of contract analysis in the preceding section of this opinion. If Miller created conditions that left Gelardi with little choice other than ending its performance of its end of the distributorship agreement then it had created "unreasonable standards of performance." For purposes of the present case at least, N.J.S.A. 56:10 7(e) can be read as a codification of a franchisor's responsibility to comply with the covenant of good faith and fair dealing. Miller's motion for summary judgment on this claim is, therefore, denied.

## V. Conclusion

I have granted Miller's motion for summary judgment in part and denied it in part. It has been granted insofar as it seeks judgment on Gelardi's Sherman Act, Robinson-Patman Act, and breach of contractually created exclusive territory claims

**654**

are concerned. It has been denied with respect to Gelardi's remaining breach of contract claims and New Jersey Franchise Practices Act claims. There also remains in this case Gelardi's allegation of tortious inference with contractual and business opportunity which was not addressed by Miller's motion. Counsel for the defendant will submit an order within ten days.