283 N.J. Super. 471 (1994)
662 A.2d 592
JOSEPH MCBRIDE, ET AL., PLAINTIFFS,
v.
MINSTAR, INC., ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Monmouth County.
Decided June 29, 1994.
*476 Michael D. Schottland, Schottland, Aaron & Manning, Freehold, for plaintiffs.
Samuel A. DeGonge, Belleville, for defendant Raichle Molitor USA, Inc.
*477 FISHER, J.S.C.
This case gives rise to a number of difficult questions concerning the legal effect of an exculpatory clause contained in a contract to sell ski equipment. Because these agreements are commonly used in the ski industry and the problems encountered in this case can be expected to reoccur, a full exposition of the matter is appropriate.

I

PROCEDURAL HISTORY

A. Factual Background
Plaintiff Joseph McBride ("McBride") seeks damages for personal injuries sustained in a fall while skiing in Massachusetts on December 27, 1987. The day before, McBride purchased ski equipment from The Ski and Tennis Chalet, Inc. ("the Chalet") in Newton Centre, Massachusetts. This equipment included Tyrolia bindings manufactured by Raichle Molitor USA, Inc. ("Raichle"), which were mounted and tested by the Chalet.

B. Significant Procedural Events
The action was commenced on September 15, 1989. On October 22, 1991, McBride filed a Second Amended Complaint joining Raichle. McBride alleged that Raichle gave "an implied warranty that the ski binding[s] would be properly set by the ski mechanic [i.e., the Chalet], based upon the ski mechanic's analysis of the case and his proper setting of the release strength." Pb. (May 19, 1994) at p. 1.
This matter came before this court for trial on May 16, 1994. Previously, a number of procedural events were entertained by other members of this court. Those events warrant some discussion since the issues then raised have resurfaced during the current proceedings.
*478 On August 20, 1993, Raichle, the only remaining defendant, moved for summary judgment asserting that there was no dispute that the Chalet was not its agent. That motion was denied. Thereafter, this matter was assigned to another judge for trial. Prior to trial, disputes arose as to the use of the deposition of a non-party witness taken in a Massachusetts action relating to this matter[1], and a mistrial was ordered on February 7, 1994.[2] Not long thereafter, Raichle again moved for summary judgment, asserting that the claim should be barred because the agreement between McBride and the Chalet contained an exculpatory clause. On May 13, 1994, that motion was denied by a third judge of the court.
Against this backdrop, this case came before me for trial on May 16, 1994. The issues surrounding the exculpatory clause, and whether the Chalet was Raichle's agent, were bifurcated from the remainder of the case. Those issues were tried to the court, without a jury, and decision reserved. The following constitutes this court's findings of fact and conclusions of law regarding the exculpatory clause (Part II, infra) and the agency issue (Part III, infra).

II

THE EXCULPATORY CLAUSE

A. The Facts
On December 26, 1987, when McBride purchased the ski equipment from the Chalet, he executed a document (P-1). The document consists of one sheet of paper approximately 7" x 14", *479 containing two columns of information. The column on the left states at the top in the largest letters on the entire document (and in red):

RETAIL AGREEMENT AND RELEASE OF LIABILITY
Following that, in slightly smaller print, is stated: "THERE ARE THREE STEPS TO COMPLETE THIS FORM." Those steps are then set forth: (1) "READ RELEASE OF LIABILITY, THEN INITIAL AND SIGN IN APPROPRIATE AREAS", (2) "FILL IN BLUE-SHADED AREA ON RIGHT HALF OF FORM" and (3) "SIGN AND DATE THE AGREEMENT AFTER EQUIPMENT IS DELIVERED TO YOU".
Step 1, which contains the exculpatory clause in question, states in white letters against a blue background: "PLEASE READ CAREFULLY BEFORE SIGNING". The entire text of the exculpatory clause is as follows:
I accept for use as is the equipment listed on this form and accept full responsibility for the care of this equipment. I have made no misrepresentations to this ski shop regarding my height, weight, age or skiing ability.
I understand and am aware that skiing is a HAZARDOUS activity. I understand that the sport of skiing and the use of this ski equipment involve a risk of injury to any and all parts of my body. I hereby agree to freely and expressly assume and accept any and all risk of injury or death to the user of this equipment while skiing.
I understand that the ski equipment being furnished forms a part of or all of the ski-boot-binding system which will NOT RELEASE at all times or under all circumstances, and that it is not possible to predict every situation in which it will or will not release, and that its use cannot guarantee my safety or freedom from injury while skiing. I further agree and understand that this ski-boot-binding system may reduce but does not eliminate the risk of injuries to the bottom one-third of my lower leg. However, I agree and understand that this ski-boot-binding system does NOT reduce the risk of injuries to my knees or any other parts of my body.
I agree that I will release this ski shop from any and all responsibility or liability for injuries or damages to the user of the equipment listed on this form, or to any other person. I agree NOT to make a claim against or sue this ski shop of injuries or damages related to skiing and/or the use of this equipment. I agree to release this ski shop from any such responsibility, whether it results from the use of this equipment by the user, or whether it arises or results from any NEGLIGENCE or other liability arising out of the maintenance, selection, mounting or adjustment of this ski equipment. (Please initial [initials of McBride]).

*480 I hereby agree to accept the terms and conditions of this contract. This document constitutes the final and entire agreement between this ski shop and the undersigned. There are NO WARRANTIES, express or implied, which extend beyond the description of the ski equipment listed on this form.
I have carefully read this agreement and release of liability and fully understand its contents. I am aware that this is a release of liability and a contract between myself and this ski shop and I sign it of my own free will.
(P-1).[3]
The only person to testify during the non-jury trial was plaintiff Joseph McBride. The only other testimony presented consisted of two depositions of Chris O'Neill, the Chalet salesman who sold the equipment to McBride.
Raichle argues that the agreement quoted above bars the present claim and urges the court to reconsider the order of May 13, 1994 (which denied Raichle's motion for summary judgment through the application of New Jersey law). Raichle contends that the prior ruling was erroneous because Massachusetts law should have applied and would have, if applied, compelled the enforcement of the exculpatory clause and the dismissal of the action. Accordingly, it is necessary to first consider whether reconsideration of the prior order is prohibited.

B. Law of the Case
It cannot be doubted that a court has the power to modify or correct its interlocutory orders prior to the entry of a final judgment. See, R. 4:42-2; Siren v. Behan, 224 N.J. Super. 130, 135, 539 A.2d 1244 (App.Div. 1988), certif. granted and summarily remanded on other grounds, 113 N.J. 323, 550 A.2d 442 (1988). This power has existed in New Jersey since at least the turn of the century. In Lyle v. Staten Island Terra-Cotta Lumber Co., 62 N.J. Eq. 797, 805, 48 A. 783 (E. & A. 1901), the Court recognized that a lower court possesses the power "to correct, pendente lite, *481 an obvious fallacy in one of its own orders." Stated another way, prior to the entry of final judgment, "the trial court has complete power over its interlocutory orders and may revise them when it would be consonant with the interest of justice to do so." Ford v. Weisman, 188 N.J. Super. 614, 619, 458 A.2d 142 (App.Div. 1983) (emphasis added).
Upon such a request a court must weigh a number of considerations: Should the court perpetuate a prior ruling, although it believes it to be erroneous, merely to give deference to a colleague's decision? Should the court expend valuable judicial resources on the trial of unnecessary issues? On the one hand, confidence in the vitality of interlocutory orders may be shaken by a free use of such inherent power; on the other, a slavish approach to the law of the case doctrine may lead to the wasting of judicial resources. In exercising its discretion, a court must balance these considerations "in the service of the ultimate goal of substantial justice." Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 264, 531 A.2d 1078 (App.Div. 1987).
In the final analysis, there is nothing about the law of the case doctrine that strictly prohibits the reconsideration of the prior rulings and this court is permitted (if not obligated) to revisit and correct prior interlocutory orders believed to be erroneous. Upon becoming the trier of fact on these issues, it remains imperative for the court to apply the law as understood to the facts found to exist. In completing this undertaking, the court should not be rigidly bound by a prior interlocutory view which is erroneous. In doing "what is fair, right and just in the circumstances", Johnson, supra, 220 N.J. Super. at 264, 531 A.2d 1078, it is necessary to vacate the prior inconsistent interlocutory order and consider again the validity, enforceability and scope of the exculpatory clause.

C. Choice of Law

1. Choosing the Correct Choice of Law Rule
Since New Jersey is the forum, its choice of law rules determine which state's substantive law should apply to the various *482 issues in this case. With respect to tort matters, New Jersey follows the flexible governmental interest analysis in the resolution of choice of law problems. See, Pfau v. Trent Aluminum Co., 55 N.J. 511, 263 A.2d 129 (1970). The determinative law is that of the state with the greatest interest in governing a particular issue. In resolving such problems, the court is required to identify the governmental policies underlying the law of each interested state, and examine how those policies affect each state's contacts to the litigation and the parties. If a state's contacts bear no relationship to the policies underlying its law, then that state has no interest in having its law govern the dispute.
With respect to the legal effect of a contract, "the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties." State Farm, etc., Ins. Co. v. Simmons' Estate, 84 N.J. 28, 37, 417 A.2d 488 (1980).
In approaching the choice of law problem, the nature of the action must first be ascertained. The issue in this case concerns the effect of a contract upon a tort claim. Few authorities from any jurisdiction can be located which would provide guidance on this mixed contract and tort situation. District Judge Schwartz recognized this same problem in his thoughtful opinion in Sellon v. General Motors Corp., 521 F. Supp. 978, 981 (D.Del. 1981) and concluded that "the legal effect of the release" on a tort action "is more properly regarded as a contract matter."[4] This court *483 agrees and finds that State Farm should apply to determine which state's law will govern the issues surrounding the validity, enforceability and scope of the exculpatory clause even though the resolution of that issue will deeply impact on the viability of McBride's tort claim.

2. The Contract Rule
Since State Farm presumptively requires the application of the law of the place of the making of the contract, the execution of the exculpatory clause in Massachusetts inexorably leads to the application of Massachusetts law. Certainly this comports with the parties' reasonable expectations at the time of formation although no evidence was offered in this regard. It is safe to infer from the circumstances that the Chalet did not anticipate the application of a foreign state's law to the agreement signed in its ski shop in Newton Centre, Massachusetts. Also, there is no reason to believe from the evidence that McBride expected to bring New Jersey's laws and policies with him when he entered this Massachusetts ski shop. While it may not have been an issue actually within the contemplation of the parties at the time of formation, the reasonable expectation of the parties was that Massachusetts law would apply. If McBride had desired the application of New Jersey law to his agreement to purchase ski equipment, he could quite easily have purchased that equipment in his home state where there is no shortage of ski shops. By contracting with a Massachusetts ski shop he must have anticipated the application of Massachusetts law just as he must have anticipated the enforcement of Massachusetts' traffic laws when he drove over the Massachusetts border on his way to Newton Centre.

3. The Tort Rule
Even if the tort choice of law rule is applied, the same *484 result would follow.[5] If the governmental interest approach is undertaken, Massachusetts law must apply.
New Jersey's only conceivable interest in having its substantive law apply to the exculpatory clause is its legitimate interest in the fair compensation of one of its residents. Mellk v. Sarahson, 49 N.J. 226, 229 A.2d 625 (1967). Its status as the forum is irrelevant. O'Connor v. Busch Gardens, 255 N.J. Super. 545, 549, 605 A.2d 773 (App.Div. 1992).
It was proven that Raichle is a New York corporation and the Chalet is a Massachusetts corporation. Also, the authorized dealer agreement (P-6) between Raichle and the Chalet then in existence stated that it was to be governed by New York law. The agreement between the Chalet and McBride, which contains the exculpatory clause in question, was executed in Newton Centre, Massachusetts. Also, the accident which resulted in McBride's injuries occurred in Massachusetts.
In suggesting a conflict between the laws of Massachusetts and New Jersey, McBride argues that New Jersey law would not uphold the exculpatory clause. In making this assertion, however, McBride fails to address the critical question: why should New Jersey's alleged hostility toward an agreement executed in Massachusetts, memorializing a business transaction which took place in Massachusetts, permit the maintenance of a claim for damages resulting from a personal injury occurring in Massachusetts? The inescapable answer is that it should not.
O'Connor is instructive. There, a New Jersey resident was injured at a Virginia amusement park owned and operated by a Delaware corporation. Contrary to New Jersey, Virginia retains the common law doctrine of contributory negligence. In choosing between Virginia and New Jersey law, the Appellate Division declared:

*485 Virginia's legitimate interest in discouraging unsafe local property conditions and unsafe conduct is directly related to the substantive issue of comparative-vs.-contributory negligence on which the conflicts question focuses. New Jersey's concern for its injured citizens is also legitimate, but it cannot exempt them from other states' law setting standards for local conditions and conduct. If New Jersey's comparative negligence doctrine followed Mrs. O'Connor on to the Twizzle Flop in Virginia, it would follow her into every other state as well, and would supplant local liability rules wherever she went. That would be an impermissible intrusion into the affairs of other states.

It is irrelevant that, for its own affairs, New Jersey prefers the comparative negligence doctrine. The test we applied does not permit us to weigh the relative desirability of competing substantive rules of law. That evaluation has already been made by the most interested state, and it is the forum state's duty to disregard its own substantive preference.
255 N.J. Super. at 549-550, 605 A.2d 773.
In following O'Connor, it is clear to this court that this hostility which New Jersey allegedly harbors for exculpatory contracts should not be permitted to intrude into the affairs of other states merely because a party to the agreement happens to be a New Jersey citizen. The authorities compel, under these circumstances, a deference to local conditions and the local laws of the foreign state when a New Jersey citizen has voluntarily entered that state and reached such an agreement with a citizen of that other state.
In a matter quite similar to the case at bar, a federal district court in New York applied New Jersey law when a New York citizen was injured in Colorado while using equipment purchased in New Jersey from a New Jersey corporation. In applying New York's governmental interest analysis test, the court was persuaded by the fact that the skis and bindings were purchased and adjusted in New Jersey by a New Jersey entity, and that the exculpatory agreement was executed in New Jersey. Mechanic v. Princeton Ski Shop, Inc., 1992 WL 397576 (S.D.N.Y. 1992).

4. Summary
Whether State Farm or the reasoning elucidated in O'Connor and Mechanic is applied, there is no question that Massachusetts law must apply to the interpretation and enforceability of the *486 exculpatory clause contained in the parties' December 26, 1987 agreement.

D. The Clause Is Enforceable
Ironically, while the parties have extensively debated the choice of law question, it will be seen that there does not appear to be any discernible difference between Massachusetts and New Jersey law on this subject.
The validity of an exculpatory clause in both states depends upon four factors:
1. the existence of a duty to the public on the part of the party seeking to avoid liability for failing to fulfill that duty, i.e., the clause will not be enforced if to do so would contravene public policy;
2. the nature of the goods provided or service performed;
3. the circumstances surrounding the formation of the contract, i.e., whether the contract was fairly entered into; and
4. whether the intentions of the parties are expressed in clear and unambiguous language.
Cormier v. Central Mass. Chapter of the Nat'l Safety Council, 416 Mass. 286, 620 N.E.2d 784, 786-87 (1993); Gonsalves v. Commonwealth, 27 Mass. App. Ct. 606, 541 N.E.2d 366, 368 n. 2 (1989); Lee v. Allied Sports Associates, Inc., 349 Mass. 544, 209 N.E.2d 329, 332-33 (1965); McCarthy v. Nat'l Assoc. for Stock Car Auto Racing & c., 87 N.J. Super. 442, 448-50, 209 A.2d 668 (Law Div. 1965), aff'd, 90 N.J. Super. 574, 218 A.2d 871 (App.Div. 1966), aff'd, 48 N.J. 539, 226 A.2d 713 (1967).
For this exculpatory clause to bar McBride's claim, it is necessary that none of these four elements be offended.

1. The Public Interest

(a) An Overview
Ordinarily the rights and duties of contracting parties are created by and arise solely from the contract itself. McCarthy, supra, 87 N.J. Super. at 448, 209 A.2d 668. In light of this freedom to contract, the parties to an agreement that does not impact on a governmental or public interest will be bound by an agreement that relieves one from liability for negligence, even *487 though such agreements are generally disfavored. Kuzmiak v. Brookchester, 33 N.J. Super. 575, 580, 111 A.2d 425 (App.Div. 1955). The court in McCarthy stated, however, that an individual cannot be relieved from liability for an obligation to comply with a "positive duty imposed by law." 87 N.J. Super. at 449, 209 A.2d 668. For that reason, in McCarthy, a raceway's attempt to avoid liability (for having failed to operate and conduct a motor vehicle race in compliance with N.J.S.A. 5:7-8) through the participants' execution of releases was barred.
McBride too hastily infers from McCarthy that New Jersey is hostile toward such releases. McCarthy, however, merely provides an example of an unenforceable exculpatory clause; it by no means suggests a presumptive ban on all such agreements. Indeed, since the Kuzmiak and McCarthy decisions, the Appellate Division has taken a broader view of the scope of such agreements. In Tessler and Son, Inc. v. Sonitrol Sec. Systems, 203 N.J. Super. 477, 485, 497 A.2d 530 (App.Div. 1985) (emphasis added), the court held that "an exculpatory clause which bars suit for negligent performance of contractual duties also bars suit for very negligent or grossly negligent performance." In so holding, the court in Tessler expressly disagreed with the more limited view of its earlier decisions in Kuzmiak and Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416, 274 A.2d 59 (App.Div. 1971). 203 N.J. Super. at 485 n. 2, 497 A.2d 530. This hardly suggests the existence of an environment hostile toward such agreements in New Jersey.
McCarthy and the other New Jersey and Massachusetts authorities teach only that one must determine whether the enforcement of a particular exculpatory clause will free a party from an affirmative duty imposed by law or otherwise hamper the vindication of valid and important public interests. Accordingly, it must be determined whether either New Jersey or Massachusetts has expressed an interest in prohibiting a member of the ski industry from contractually avoiding liability, or whether there is an ascertainable *488 policy in either of those states that would place skiers within a protected class.
As will be seen, there is nothing to suggest that the people of either New Jersey or Massachusetts would require the courts to approach skiers with special solicitude or render them immune from the effects of their private agreements with the skiing industry. In fact, skiing legislation in both New Jersey and Massachusetts evidences that the contrary is true.

(b) Skiing Legislation
Not surprisingly (geographically speaking), the legislatures of both New Jersey and Massachusetts have enacted laws regulating certain aspects of the skiing industry. These statutes warrant close examination.

(i) New Jersey
In light of the Vermont Supreme Court's affirmance[6] of the first significant jury verdict against a ski area operator for a "downhill" injury[7], the New Jersey Legislature responded in 1979. See, Pietruska v. Craigmeur Ski Area, 259 N.J. Super. 532, 537, 614 A.2d 639 (Law Div. 1992). Its response was to enact N.J.S.A. 5:13-5 (emphasis added) which provides:

A skier is deemed to have knowledge of and to assume the inherent risks of skiing, operating toboggans, sleds or similar vehicles created by weather conditions, conditions of snow, trails, slopes, other skiers, and all other inherent conditions. Each skier is assumed to know the range of his ability, and it shall be the duty of each skier to conduct himself within the limits of such ability, to maintain control of his speed and course at all times while skiing, to heed all posted warnings and to refrain from acting to [sic] a manner which may cause or contribute to the injury of himself or others.
The Legislature has declared, in defining the obligations of ski area operators and skiers, that "the sport of skiing ... involve[s] risks which must be borne by those who engage in such activities." *489 N.J.S.A. 5:13-1b. The legislation also acknowledges that there are "risks which the skier voluntarily assumes for which there can be no recovery." Id.
The view that skiing contains "inherent risks" which the skier "is deemed to have knowledge of and to assume" has been clearly expressed by our Legislature. N.J.S.A. 5:13-5. This demonstrates that our Legislature has not placed skiers, who have suffered "downhill" injuries, within a protected class. This is the best evidence that New Jersey would not frown upon the skiing industry's extraction of an exculpatory clause from a skier.

(ii) Massachusetts
The same sentiments have been expressed in the Commonwealth of Massachusetts. In defining the obligations of a ski area operator, the Massachusetts Legislature determined that "ski area operators shall not be liable for damages to persons or property, while skiing, which arise out of the risks inherent in the sport of skiing." Mass. Gen. L.A. Ch. 143, § 71N(6). The Legislature also declared that:
A skier shall be presumed to know the range of his own ability to ski on any slope, trail or area. A skier shall be presumed to know of the existence of certain unavoidable risks inherent in the sport of skiing, which shall include, but not be limited to, variations in terrain, surface or subsurface snow, ice conditions or bare spots, and shall assume the risk of injury or loss caused by such inherent risks.

Mass. Gen. L.A. Ch. 143, § 710 (emphasis added). Just as in New Jersey, it is clear that skiers making claims for personal injuries are not members of a favored class in Massachusetts, since those claims constitute "a constant drain on the ski industry." Grass v. Catamount Development Corp., 390 Mass. 551, 553, 457 N.E.2d 627, 629 (1983).

(c) Summary
The skiing legislation in both New Jersey and Massachusetts demonstrates a strong policy disfavoring skiers' claims for "downhill" injuries. There is no evidence of a public duty on the part of a manufacturer or distributor of skiing equipment to bear the risk of "downhill" injuries. Neither New Jersey or Massachusetts *490 prohibits a manufacturer or distributor from obtaining a skier's release of claims for downhill injuries and the risks inherent in the sport.

2. The Goods and Services Provided
Also to be considered is whether the goods or services provided by the party seeking to be exculpated constitute a practical necessity or something of great public importance.
Undoubtedly, skiing is a recreational pastime enjoyed by many people. But it is just that  recreational. The manufacture or distribution of ski equipment is not to be equated with the providing of a necessary public service, such as housing, Kuzmiak, supra; public transportation, Horelick v. Pennsylvania R. Co., 13 N.J. 349, 357, 99 A.2d 652 (1953); utilities, Mayfair Fabrics v. Henley, 48 N.J. 483, 487, 226 A.2d 602 (1967); or medical treatment, Tunkl v. Regents of University of California, 60 Cal.2d 92, 32 Cal. Rptr. 33, 383 P.2d 441 (1963) (cited with approval in Mayfair, 48 N.J. at 487-488, 226 A.2d 602). The present situation is far more akin to those instances not involving a necessity. See, e.g., Abel Holding Co. v. American Dist. Telegraph Co., 138 N.J. Super. 137, 350 A.2d 292 (Law Div. 1975), aff'd, 147 N.J. Super. 263, 371 A.2d 111 (App.Div. 1977) (contract to install fire alarm); Foont-Freedenfeld Corp. v. Electro-Protective Corp., 126 N.J. Super. 254, 314 A.2d 69 (App.Div. 1973), aff'd, 64 N.J. 197, 314 A.2d 68 (1974) (contract to install burglar alarm); Midland Carpet Corp. v. Franklin Assoc. Properties, 90 N.J. Super. 42, 216 A.2d 231 (App.Div. 1966) (commercial lease). Indeed, in a case essentially identical to the matter sub judice, with which this court agrees, the United States District Court for the District of Colorado said:
The service here [the renting of ski equipment] is recreational. Although skiing is a recreational activity enjoyed by many, by definition and common sense, it is neither a matter of great public importance nor a matter of practical necessity. Therefore there is no public duty that prevents enforcement of this [exculpatory] agreement.
*491 Bauer v. Aspen Highlands Skiing Corp., 788 F. Supp. 472, 474 (D.Colo. 1992).

3. Formation of the Contract
The court must also examine whether the contract was fairly formed. In this case, without question, the evidence advanced during the hearing demonstrated that it was.
First, as a general matter, there is nothing unfair about a ski equipment dealer exacting such an agreement from a customer. Merely because the Chalet would not sell the equipment without McBride's execution of the agreement does not render it a contract of adhesion. A contract of adhesion is one which is not bargained for, but rather imposed on a member of the public for a necessary service on a take-it-or-leave-it basis. See, Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353, 605 A.2d 681 (1992). Again, an exculpatory clause placed in a lease during a housing shortage, see, Kuzmiak, supra, or in an insurance policy where the consumer may not have the type of bargaining power possessed by the insurer, see, Owens-Illinois Inc. v. United Ins. Co., 264 N.J. Super. 460, 468, 625 A.2d 1 (App.Div. 1993), are classic examples of contracts of adhesion. But, it is the need for the goods or services provided, coupled with a take-it-or-leave-it approach, that creates disparate bargaining power.
When an individual enters a ski shop to buy ski equipment, s/he does not have a need for those goods and services, merely a desire. Should the seller demand exculpation as a condition for the sale of the equipment, the purchaser is free to walk away. This is not so with the consumer of automobile insurance, or the individual who cannot find a place to live during a housing shortage. Unlike the skier, these individuals must face an inability to use their automobile, or the prospect of becoming homeless, if they are not willing to sign on the dotted line and exculpate the provider. The skier merely faces the prospect of a ski-less weekend.
*492 Second, there is nothing about the attending circumstances that would suggest that this contract was somehow unfairly formed. While McBride testified at trial that he did not carefully read the document until after his injury, he also testified at his September 7, 1990 deposition that he was fully apprised at the time of formation:
Q: Did you read the agreement before you signed it?
A: Yes.
Q: Did you understand it to be a release of liability?
A: Yes.
Q: Did you sign it voluntarily, without coercion?
A: No other coercion than he said, "You can't purchase the skis without signing the [re]lease."
Q: You were agreeable to that, were you?
A: Yes.
Q: And being agreeable to it, after having read the form, you affixed your signature to the bottom twice?
A: Yes.
Q: Did you read it carefully?
A: Yes. Where it says release of liability?
Q: Yes?
A: Yes....
McBride Dep. at 29. Even if this deposition testimony was ignored, and it is assumed that McBride chose not to read the document prior to execution, it does not impact on the end result. "Any failure on the part of [the party to be bound] to read or comprehend the release language was, in the absence of fraud, immaterial." Simon v. Simon, 35 Mass. App. Ct. 705, 625 N.E.2d 564, 570 (1994); accord, Raroha v. Earle Finance Corp., Inc., 47 N.J. 229, 234, 220 A.2d 107 (1966). In short, McBride is bound by the agreement regardless of his recently-claimed failure to carefully read it.
Further, McBride's background does not support any suggestion that the exacting of such an agreement from him was unconscionable. He possesses a college education and attended a business law course at Monmouth College. In fact, McBride testified that he felt that the exculpatory clause would be unenforceable *493 based upon what he learned during that business law course (suggesting the accuracy of the old adage that a little learning may be a dangerous thing).
The inconsistencies between his past and present testimony, as well as McBride's general demeanor and attempts to avoid some of the questions asked of him, lead me to find that he did in fact read the agreement prior to signing it and had an understanding (albeit incorrect) as to its future legal effect.[8] Of course, this hardly matters since McBride had the opportunity to take the time to read the document prior to signing. Whether he chose to avail himself of that opportunity as he said at his deposition, see, McBride Dep. at 29, or not, as he said at trial, is not as germane as the existence of the opportunity. While it is undisputed that the opportunity was provided to him, I find that McBride provided truthful responses at his deposition and that he did, in fact, avail himself of that opportunity.

4. The Contract Is Unambiguous
McBride, by executing the document, agreed
 to "accept full responsibility for the care of [the] equipment"
 that "skiing is a HAZARDOUS activity ..."
 that "the use of [the] equipment involve[s] a risk of injury to any and all parts of my body"
 "to freely and expressly assume and accept any and all risks of injury or death to the user of this equipment while skiing"
 to "release this ski shop from any and all responsibility or liability for injuries or damages to the user of the equipment" and
 "NOT to make a claim against or sue this ski shop for injuries or damages related to skiing and/or the use of this equipment."
The thrust of the contract was then, and is now, unmistakable. It contains McBride's acknowledgement of the dangers of the sport and that the equipment was not designed to avoid all injuries. It also states in plain English that the purchaser will not assert a *494 claim for injuries "related to skiing and/or the use of this equipment". It is unambiguous.
McBride has not disputed, and in the face of this unambiguous language cannot dispute, that the contract, if enforced, must bar his claim against those entities encompassed by the contract.

5. Summary
The exculpatory clause is valid and enforceable whether examined under New Jersey or Massachusetts law. While no court of either state has previously examined the validity of the ski industry's commonly-used exculpatory clause, this court is satisfied that such an agreement is enforceable under the circumstances presented in either New Jersey or Massachusetts. It is noteworthy that the view that such agreements are enforceable when extracted from a skier is shared by a majority of other jurisdictions. See, Del Bosco v. U.S. Ski Ass'n, 839 F. Supp. 1470 (D.Colo. 1993) (Colorado); Bauer, supra, (Colorado law); Mechanic v. Princeton Ski Shop, Inc., 1992 WL 397576 (S.D.N.Y. 1992) (New Jersey law); Weiner v. Mt. Airy Lodge, Inc., 719 F. Supp. 342 (M.D.Pa. 1989) (Pennsylvania law); Rubin v. Loon Mountain, 1985 WL 101 (E.D.Pa. 1985) (New Hampshire law); Poskozim v. Monnacep, 131 Ill. App.3d 446, 86 Ill.Dec. 663, 475 N.E.2d 1042 (1985); Zimmer v. Mitchell and Ness, 253 Pa.Super. 474, 385 A.2d 437 (1978), aff'd, 490 Pa. 428, 416 A.2d 1010 (1980); Douglass v. Skiing Standards, Inc., 142 Vt. 634, 459 A.2d 97 (1983); Scott v. Pacific West Mountain Resort, 119 Wash.2d 484, 834 P.2d 6 (1992); Milligan v. Big Valley Corp., 754 P.2d 1063 (Wyo. 1988). But see, Sirek v. Fairfield Snowbowl, Inc., 166 Ariz. 183, 800 P.2d 1291 (1990); Moore v. Sitzmark Corp., 555 N.E.2d 1305 (Ind. App. 1990). It is unimaginable that either New Jersey or Massachusetts would adopt a minority view in light of their legislatures' views on skiing.

E. The Scope of The Exculpatory Clause
Finding the exculpatory clause enforceable does not end the inquiry. Before it can be said that the clause will benefit Raichle, the scope of its terms and its legal effect must be examined.

*495 1. Its Terms
The document itself states that McBride "will release this ski shop from any and all responsibility" and that McBride agrees "NOT to make a claim against or sue this ski shop ..." (P-1) (emphasis added). The issue now to be resolved concerns the scope and meaning of the term "this ski shop".
The intention of the parties to this contract is to be ascertained from the language they used in light of the circumstances in which they used it. See, e.g., Mayfair Fabrics v. Henley, 101 N.J. Super. 363, 376, 244 A.2d 344 (Law Div. 1968). The facts, as I have found, and which are not disputed, indicate that McBride walked into the Chalet on December 26, 1987, and purchased certain ski equipment by way of the contract in question. While the contract does not contain the Chalet's name, it cannot be disputed that "this ski shop" was intended to include, at least, the Chalet. Certainly, the parties were not referring to a ski shop a few blocks away or in another town, or back in New Jersey, when they referred to "this ski shop"[9].
Whether "this ski shop" refers to Raichle is problematic. The names "Raichle" and "Tyrolia" are contained on the face of the document, but it would be stretching the phrase "this ski shop" to include the manufacturers of the products being sold. The primary meaning of the word "shop"[10] is "a small retail store or a specialty department in a large store." Webster's II New Riverside University Dictionary 1077 (1984). The word connotes a relatively diminutive place of business. Certainly, the term "this ski shop" cannot be said to have been intended to include Raichle. No matter how much "play" there may be "in the joints" of the document, there can be no doubt that the phrase in question, to *496 "the normal speaker of English", includes only the Chalet. See, Holmes, "The Theory of Legal Interpretation," 12 Harv.L.Rev. 417, 418 (1899).

2. Its Legal Effect
Having established that the exculpatory clause expressly encompasses only the Chalet, its legal effect on the claim against Raichle must be addressed. Impacting on this issue is McBride's forceful contention that the Chalet was Raichle's agent. Assuming, for the moment, that is so, the question now becomes whether McBride released Raichle, the Chalet's alleged principal, from this claim when he released the Chalet.
Again, it is Massachusetts law which must be turned to in order to determine the impact of the asserted agency relationship on the rights and obligations of Raichle. See, Part IIC, above. Unlike the question concerning the enforceability of the clause, there appears to be a "true conflict" between Massachusetts and New Jersey law on this particular subject.

(a) Massachusetts
The Supreme Judicial Court of Massachusetts has recently stated, in unmistakable language, that the release of an agent releases any vicarious claims against the principal. In considering whether a person injured in an automobile accident could maintain an action against the employer of the faulty driver, after having released the employee, the court said:
... the principles of vicarious liability apply where only the agent has committed a wrongful act. The principal is without fault. The liability of the principal arises simply by the operation of law and is only derivative of the wrongful act of the agent. Because of this, established case law holds that a general release given to an agent will preclude a subsequent action against his principal.
Elias v. Unisys Corp., 410 Mass. 479, 481-482, 573 N.E.2d 946, 947-948 (1991) (emphasis of the court; citations omitted); see also, Karcher v. Burbank, 303 Mass. 303, 21 N.E.2d 542 (1939); Minery v. Fenton, 29 N.J. 409, 415-417, 149 A.2d 245 (1959) (applying Massachusetts law). There can be no doubt that Massachusetts *497 law bars the claim against Raichle because of the exculpation of the Chalet.

(b) New Jersey
McBride relies only on New Jersey law in contending that under such circumstances only the claim against the agent is released. As authority, McBride refers to Breen v. Peck, 28 N.J. 351, 146 A.2d 665 (1959), and other similar New Jersey decisions, which hold that the release of one tortfeasor does not release another unless the intent to do so is expressed. That argument, however, misses the mark not only because the content of New Jersey law on this issue is irrelevant but also because New Jersey law may not extend quite that far.
The rationale behind Breen v. Peck, supra and McFadden v. Turner, 159 N.J. Super. 360, 388 A.2d 244 (App.Div. 1978) (which held that the release of an employee does not release the employer) is that the release of one should not release another who is independently liable to the plaintiff. It is noteworthy that in McFadden, the court stressed that the release of the employee would not release the employer in that case because of the independent bases of liability against each. 159 N.J. Super. at 366, 388 A.2d 244 (emphasis added) ("we see no reason why the rule [that the release of one tortfeasor does not release another] should not apply as well to the single act of negligence for which both the actual wrongdoer and his master or principal are each independently liable"). Unlike the Elias decision of the Supreme Judicial Court of Massachusetts, and unlike this case, the claim against the employer in McFadden was not based on a theory of respondeat superior. Considering that distinction, there is no reason to believe despite McFadden's dictum[11] that prior New Jersey authorities which would bar a claim against an employer or *498 principal when the employee or agent has been released  so long as the theory is based on respondeat superior  do not remain viable. See, Aljian v. Ben Schlossberg, Inc., 8 N.J. Super. 461, 73 A.2d 290 (Law Div. 1950) (Proctor, J.); United States Fidelity and Guar. Co. v. Goetze, 108 N.J. Eq. 210, 154 A. 524 (Chan. 1931). While Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 559-561, 410 A.2d 674 (1980) has approved of the court's holding in McFadden, it is noteworthy that Cartel only indicates that the release of an employee will not release the employer where the parties have expressly indicated an intention not to release the employer, a situation not present here.[12]
Viewing the question through an analysis based upon contract theories leads to the same conclusion. The existence of a principal-agent relationship inherently presupposes that the agent has the authority to speak, act or contract on behalf of the principal. Thus an agreement between an agent and a third-party, by its very nature, normally creates an enforceable agreement between the principal and that third-party.
By arguing the Chalet to be Raichle's agent, McBride must concede that on December 26, 1987 he entered into an agreement with Raichle as well as the Chalet. If the Chalet is assumed to be an agent, then Raichle was a disclosed, or at least partially disclosed, principal[13]. That being the case, McBride intended to *499 enter into a contractual relationship with Raichle. See, Restatement, Agency 2nd § 143, ("where the principal is either disclosed or partially disclosed, that is, where either the identity or the existence of the principal is disclosed, the other party to the transaction normally intends to enter into relations with the principal"); id., § 147 ("unless otherwise agreed, a disclosed or partially disclosed principal is a party to a contract ... made by his agent within his authority"). This is so even if the agent makes the promises in the first person or makes no mention of the principal. Thus, absent contrary evidence, the principal is understood to be a party to the transaction. Id., § 143; Looman Realty Corp. v. Broad Street Nat. Bank of Trenton, 32 N.J. 461, 476-477, 161 A.2d 247 (1960). Again, this is a natural consequence of the precise finding which McBride would have this court draw from the evidence presented (i.e., that the Chalet was Raichle's agent).
It follows that Raichle, the principal, is entitled to assert "all defenses arising out of a transaction between his agent and a third person." Id., § 180. One of those defenses is the very defense which was built into the agreement which the agent entered into on behalf of its purported principal: the release of future liabilities. In short, under the circumstances, it is clear that when McBride released the Chalet from liability, he a fortiori released Raichle.
McBride's contrary argument, in essence, takes a strict and unwarranted view of the "community of contract." There can be no doubt that a contract between two parties can bestow legally enforceable rights, or impose enforceable obligations, on persons who are not parties to the contract. Beneficiaries of trusts, see, Matter of Estate of Karas, 197 N.J. Super. 642, 485 A.2d 1083 (App.Div. 1984), consumers of retailed goods, see, Henningsen v. *500 Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), and third-party donees of promises to make a particular will, see, Naimo v. LaFianza, 146 N.J. Super. 362, 367, 369 A.2d 987 (Ch.Div. 1976), among others, are beneficiaries of promises made to persons other than themselves. Obligations may also be imposed on non-contracting parties. The most common is the present example. If the Chalet was Raichle's agent, the agreement between the Chalet and McBride imposed obligations on Raichle without Raichle having been a signatory to the document.
McBride has chosen to view the Chalet as Raichle's agent. Because of that, he must not only take the benefits bestowed upon him if that classification is correct, but also the detriments that flow therefrom. In approaching the same question from the opposite side of the coin, our Supreme Court has stated that "[a] principal must either ratify the entire transaction or repudiate it entirely, and cannot pick and choose only what is advantageous to him." Thermo Contracting Corp. v. Bank of N.J., 69 N.J. 352, 362, 354 A.2d 291 (1973). The same should hold true when it is the third-party who seeks a finding that one party is the agent of another. He must accept that classification with all its consequences. He cannot "pick and choose" what it is about that relationship which benefits him and discard the detriments it carries.

3. Summary
The exculpatory clause expressly includes the Chalet as an entity which McBride agreed not to sue for downhill injuries occurring through the use of the ski equipment. It does not, however, expressly include Raichle. Nevertheless, in applying the substantive law of Massachusetts, as required by New Jersey choice of law rules, McBride's release of the Chalet (Raichle's alleged agent) also released all allegations that Raichle is vicariously liable for the acts or omissions of the Chalet. Elias, supra, *501 573 N.E.2d 946.[14] And, while less certain, New Jersey law may also be viewed as compelling the same result. See, Part IIE(2)(b), supra.[15]

III

AGENCY
The second issue tried to the court without a jury was the question of whether the Chalet was, in fact, the agent of Raichle. The discussion in Part II above was premised upon McBride's contention that the Chalet was the agent of Raichle. Certainly if McBride were to retract that concession in order to avoid the effect of the exculpatory clause, then the claim against Raichle *502 would still fail since it is based solely upon McBride's claim that Raichle is vicariously liable for the acts or omissions of that agent.
In short, in order to pursue a cause of action against Raichle, McBride necessarily had to take the position that the Chalet was Raichle's agent. Based upon his theory of liability (i.e., that Raichle gave "an implied warranty that the ski binding would be properly set by the ski mechanic, based upon the ski mechanic's analysis of the case and his proper setting of the release strength," Pb. (May 19, 1994) at 1), the claim would fail if McBride could not prove an agency relationship between the Chalet and Raichle. However, by electing to urge the existence of an agency relationship, for the reasons set forth in Part II above, it must be concluded that McBride released his claim against Raichle by releasing the Chalet.
While it may be viewed as something of a catch-22 for McBride, it is a quandary of his own making. McBride cannot reap the benefits of this alleged agency relationship, without incurring the detriments as well. McBride has not asserted or maintained a cause of action against Raichle independent of the acts or omissions of the Chalet, and McBride cannot pursue a claim against Raichle based on respondeat superior since Raichle's agent was released from liability. Because of McBride's election to contend that the Chalet was Raichle's agent and because of the effect of the alleged agency relationship on the exculpatory clause in question, it is not necessary for the court to resolve factually whether the Chalet was the agent of Raichle.

IV

CONCLUSION
Based on the foregoing, the court finds the exculpatory clause to be valid and enforceable. The court also finds that while the exculpatory clause does not expressly include Raichle, but that by releasing the Chalet, McBride, a fortiori, released Raichle. Accordingly, McBride's claim that Raichle impliedly warranted that *503 its ski mechanic (i.e., the Chalet) would properly set the release strength on the bindings, or that Raichle was otherwise vicariously liable for the acts or omissions of the Chalet, is barred by the exculpatory clause.
Judgment accordingly will be entered for Raichle.
*504 
NOTES
[1] McBride brought an action in Massachusetts state court against the Chalet. McBride et al. v. The Ski & Tennis Chalet, Inc., Civil No. 9012-RM-38 (Newton District Court). That action was terminated when McBride gave the Chalet a covenant not to sue.
[2] Why a "mistrial" was ordered is unclear since a jury was never selected at that time.
[3] For a better appreciation of how well the printed form provides notice of this exculpatory agreement, a photocopy of P-1 is appended. It should be recognized, though, that the various colors used on the form (not revealed by the black-and-white version attached) make even more noticeable the intent sought to be conveyed by the document.
[4] There appears to be no consensus as to whether contract or tort choice of law rules should apply when determining whether a release should be construed or enforced so as to bar a tort claim. Unlike the court in Sellon, most courts appear to apply one rule or the other without recognizing the problem or explaining why the choice was made. See, e.g., Reuther v. Southern Cross Club, Inc., 785 F. Supp. 1339, 1341 (S.D.Ind. 1992) (tort choice of law rule applied); Horizon Financial F.A. v. Hansen, 791 F. Supp. 1561, 1568 (N.D.Ga. 1992) (contract choice of law rule applied). Even the Restatement, Conflict of Laws 2d appears schizophrenic on this issue. See, id., § 170 (tort choice of law rule applies); but see, id., comment to § 170 at p. 509 ("The effect of the instrument as between the parties thereto, or as to a third party beneficiary, is determined by the law which governs the instrument as a contract").
[5] In short, a "false conflict" is presented in the choosing of the correct choice of law rule, just as was found by Judge Schwartz in Sellon, supra.
[6] See, Sunday v. Stratton, 136 Vt. 293, 390 A.2d 398 (1978).
[7] A "downhill" injury is one which occurs during the act of skiing. An "uphill" injury is one which occurs, for example, on a ski lift.
[8] McBride testified that he had executed similar agreements in the past when renting ski equipment. Accordingly, he had a basic understanding of the intent of the document prior to execution.
[9] The word "this" suggests immediacy. Its primary definition indicates: "the ... thing present, nearby or just mentioned." Webster's New Riverside University Dictionary 1204 (1984).
[10] The word "shop" is derived from the Old English word "sceoppa," which spawned the Middle English word "shoppe", both meaning "booth" or "stall".
[11] "The rationale of the rule is equally apposite whether the liability is actual or vicarious  namely, that plaintiff is entitled to pursue all those who are independently liable to him for his harm until one full satisfaction is obtained." 159 N.J. Super. at 367, 388 A.2d 244.
[12] McBride, in this regard, references the covenant not to sue which he gave to the Chalet in the related Massachusetts action. While, under Cartel, that covenant would not bar the subsequent action against Raichle, it is the exculpatory clause in the December 26, 1987 agreement which forms the basis for Raichle's argument that the claim is barred. There is nothing in that latter document, expressed or implied, which would suggest the intent of the parties to preserve a potential claim by McBride such as that asserted herein.
[13] There is no question but that Raichle's identity and existence were made known to McBride by the Chalet. The name "Tyrolia" appears prominently at the top of the preprinted form (above the column on the right) and the names of the manufacturers of the equipment were handwritten in the appropriate blanks. In addition, if that were not enough, reference is made in the document to the existence of the manufacturer. E.g.,

 "All functional procedures have been completed according to manufacturer's recommendations"
 "I [McBride] agree that I have received the manufacturer's written materials".
(P-1).
[14] It is noteworthy that the view of this issue expressed by the Supreme Judicial Court of Massachusetts is in accord with the great majority of jurisdictions. See, Estate of Bruce v. B.C.D., Inc., 396 F. Supp. 157 (D.Iowa 1975); Seaboard Air Line R. Co. v. Coastal Dist. Co., 273 F. Supp. 340 (D.S.C. 1967); Dean v. Bennett M. Lifter, Inc., 336 So.2d 393 (Fla.App. 1976), cert. denied, 345 So.2d 421 (Fla. 1976); Harris v. Hanna Creative Enters., 208 Ga. App. 549, 430 S.E.2d 846 (1993), cert. vacated, 263 Ga. 774, 439 S.E.2d 476 (1994); Bristow v. Griffitts Constr. Co., 140 Ill. App.3d 191, 94 Ill.Dec. 506, 488 N.E.2d 332 (1986); Copeland v. Humana of Kentucky, Inc., 769 S.W.2d 67 (Ky. 1989); Felsner v. McDonald Rent-A-Car, Inc., 193 Mich. App. 565, 484 N.W.2d 408 (1992); Reedon of Fairbault, Inc. v. Fidelity & Guaranty Ins. Underwriters, Inc., 418 N.W.2d 488 (Minn. 1988); Pioneer Animal Clinic v. Garry, 231 Neb. 349, 436 N.W.2d 184 (1989); McGee v. County of Wilson, 574 S.W.2d 744 (Tenn. 1978); Holmestead v. Abbott G.M. Diesel, Inc., 27 Utah 2d 109, 493 P.2d 625 (1972). But see, McFadden, 159 N.J. Super. at 360, 388 A.2d 244; Biles v. Harris, 521 P.2d 884 (Okla. Ct. App. 1974).
[15] It will be recalled that the relationship between the Chalet and Raichle was created by a contract which was to be construed by New York law (P-6). While no one has argued that New York law should govern any issues that have been raised, it is noteworthy that New York is also in accord with Massachusetts on the question of whether the release of the agent bars a claim against the principal. See, Gavin v. Malherbe, 146 Misc. 51, 261 N.Y.S. 373 (1932), aff'd, 240 A.D. 779, 266 N.Y.S. 897 (2d Dept. 1933), aff'd, 264 N.Y. 403, 191 N.E. 486 (1934); International Halliwell Mines, Ltd. v. Continental Copper & Steel Industries, Inc., 544 F.2d 105, 109-110 (2d Cir.1976).